Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Victor Manuel CELORIO, | Gainesville Division |
| *PRO SE* Plaintiff, | |
| -against- | 1:11-CV-79-SPM/JRG |
| GOOGLE, INC., et all. | Jury Trial Requested |
| DEFENDANTs. | |

## Plaintiff's Motion for Summary Judgment
## Pursuant to F.R.C.P. 56

1. Plaintiff VICTOR CELORIO, *Pro Se* Plaintiff, pursuant to Fed. R. Civ. P. 56, respectfully moves this Honorable Court for Summary Judgment on Claims I and II of the Plaintiff's Amended Complaint (Document 13).

2. According to Local Rule 7.1(B), Plaintiff did not need to confer with defendant's counsel before making this motion.[1]

---

[1]   LOCAL RULE 7.1 Motions, General

(B) Counsel shall clearly identify those motions which are consented to in their entirety. Counsel for the moving party, or a party proceeding pro se, need not confer with counsel for all other parties before making the following motions:

(3) Motions in civil cases for judgment as a matter of law, **for summary judgment**, and for new trial;

Filed1024'12UsDcFln1AM0950

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

# Table of Contents

A Simple and Straightforward Case of Patent Infringement........................................................................4

Claims Upon Which Judgment Is Sought...................................................................................................6

Claims I and II Burden Of Proof And Elements.........................................................................................6

Plaintiff Is Entitled To Summary Judgment On Claims I and II
Based On The defendant's First Affirmative Defense of No Patent Infringement....................................7

Elements That Cannot Be Proven By The Defendant...............................................................................10

Plaintiffs Evidence Presented as Rebuttal for Defendant's First Affirmative Defense............................11

SCIENTIFIC TEST ON GOOGLE BOOKS' PDF FILES.........................................................................12

Tests of Google Books PDF files..............................................................................................................13

Corroborating Test....................................................................................................................................20

Plaintiff is entitled to Summary Judgment on Claim I and II
based on the Defendant's Second Affirmative Defense - Invalidity..........................................................20

Standard of Law for Validity.....................................................................................................................21

Evidence of Invalidity................................................................................................................................21

Prior Art....................................................................................................................................................22

Enabling disclosure...................................................................................................................................22

References cited by Defendant as Prior Art .............................................................................................23

References Published After The Priority Date..........................................................................................24

Patents cited as Prior Art by Defendant...................................................................................................27

MEYER Patent Teaches Away..................................................................................................................27

LEWIS Is Old Art.....................................................................................................................................28

ROSENBERG Is Old Art..........................................................................................................................28

Unidentified Loose Sheets........................................................................................................................29

Defendant's Evidence Cannot Prove Invalidity........................................................................................30

Expert Witness Mr. William E. Kasdorf...................................................................................................30

Plaintiff's Objective Indicia Of Novelty...................................................................................................32

Sample Of Article References....................................................................................................................34

Plaintiff's Objective Indicia Of Non-Obviousness...................................................................................37

Commercial Success Of The Patented Invention......................................................................................38

2

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

Affirmative Defense of failure of written description,
lack of enablement, and/or claim indefiniteness........................................................................39

Plaintiff's Evidence Of Willfulness.........................................................................................40

Defendant Concealed Discoverable Information ....................................................................41

Manuel Tamez Emails...............................................................................................................42

Latches Doctrine........................................................................................................................44

Plaintiff's Evidence Of Damages ............................................................................................44

Genuine Elements of Dispute....................................................................................................47

Conclusion..................................................................................................................................48

Relief...........................................................................................................................................48

AUTHORITIES...........................................................................................................................50

RULES.........................................................................................................................................55

REFERENCES............................................................................................................................56

CERTIFICATE OF SERVICE....................................................................................................57

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

## A Simple and Straightforward Case of Patent Infringement

3. This is a simple and straightforward case of patent infringement, in spite of all the protestations from the defendant.

4. Patent 6,012,890 (hereinafter '890) was issued on January 11, 2000 to Inventor Victor Manuel Celorio Garrido, (Victor Celorio) from Gainesville, Florida. (EXHIBIT A).

5. Defendant Google Inc. (hereinafter "Google"), is a Florida registered corporation. (EXHIBIT Zd) that, on August 3, 2009, signed a contract with ON DEMAND BOOKS, LLC. (hereinafter ODB) to distribute and print on demand paper books through ODB machines around the world. (Document 23. Confidential Document).

6. ODB is a Delaware company (EXHIBIT F1) that manufactures book on demand equipment. (EXHIBIT F2) (see videos EXHIBIT W1, EXHIBIT W2, EXHIBIT W3, EXHIBIT W4, EXHIBIT W5, EXHIBIT W6) On September 17, 2009 defendant announced the deal between the two companies and installed one of ODB machines in its headquarters in California. (EXHIBIT G).

7. On April of 2011 Victor Celorio, the inventor of the technology protected by patent '890, sued Google Inc., ODB, Jason Epstein and Joe Does 1 to 3 in this court for patent infringement, and on 07/21/2011 filed an Amended Complaint, which is the origin of this Motion for Summary Judgment. (Document 1 and Document 13)

8. ODB and Jason Epstein were dismissed from the instant case on Jurisdictional grounds on April 30, 2012. defendant Google filed his response to Plaintiff's Amended Complain on

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

07/06/12. (Document 38)

9. In his response, defendant acknowledges that Google indeed performs all the acts that
Plaintiff describes related to storing book files, allowing customers to search the content of those
books and then have any one of those book files delivered electronically to an ODB machine to
be printed and bound. Further, defendant specifies that he has an ongoing commercial activity
with On Demand Books (ODB) to distribute around the world and print and bind on demand
physical paper bound books using defendant's book files and ODB machines, and accepts that
one of those machines was installed at defendant's premises in California in 2011. (Document
45)

10.   The defendant admits to all of those facts and asserted an Affirmative Defense of six
points:

> First Defense, Non-infringement
> Second Defense - Patent invalidity
> Third Defense - Limitation on Patent Damages
> Fourth Defense - Substantial Non-Infringing Uses
> Fifth Defense - Laches
> Sixth Defense - Failure to State a Claim. (Document 45)

11.   Of those Defenses, only the first two are triable of fact. The rest are a matter of law for
the judge to decide. Summary judgment is as appropriate in a patent case as it is in any other
case.[2]

---

2   Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998) (quoting C.R. Bard, Inc. v. Advanced Cardiovascular, Inc.,
911 F.2d 670, 672 (Fed. Cir. 1990)); see also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1561 (Fed. Cir. 1988); Spectra
Corp. v. Lutz, 839 F.2d 1579, 1581 n.6 (Fed. Cir. 1988). Summary judgment may be particularly appropriate in patent cases where the only
real dispute between the parties is that of claim construction—which is a question of law for the court to decide.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

12.     It is proper for a court to hear a summary judgment motion prior to construing all of the disputed claim terms. There is no requirement that the court conduct a Markman hearing and construe claims prior to hearing summary judgment motions. The court has discretion to construe claims, if needed, in the context of a summary judgment motion.[3]

13.     The court need only construe the disputed claim language "to the extent necessary to resolve the controversy."[4]

## Claims Upon Which Judgment Is Sought

14.     Plaintiff is entitled to summary judgment on Claims I and II of his Amended Complaint (Document 13) and is grounded on the defendant's incapacity to prove his affirmative defenses of Non-infringement and Invalidity.

## Claims I and II Burden Of Proof And Elements

15.     Plaintiff has presented abundant evidence to prove his case. EXHIBIT Y contains 46 pages that describe in detail the mode of infringement of each claim, with precise references to the written description in the specifications and enablement of each one of the claims.

16.     In Claim I and II of the First Amended Complaint (Document 13), the burden of proof shifts to the defendant by his relying on an Affirmative Defenses. It is acknowledged so by

---

3    See Markman v. Westview Instruments, Inc., 52 F.3d 967, 981 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

4    Vivid Techs., Inc. v. Am. Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999); see also Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all other issues presented by the parties."); Biovail Corp. Int'l v. Andrx Pharms., Inc., 239 F.3d 1297, 1301 (Fed. Cir. 2001) (finding it unnecessary to construe claim term that was not relevant to outcome of the case). In re Gabapentin Patent Litig., 395 F. Supp. 2d 153, 158 n.3 (D.N.J. 2005) (deciding summary judgment motion without Markman hearing); Aspex Eyewear, Inc. v. E'lite Optik, Inc., No. 3:98-CV-2996D, 2001 WL 204775, at *2 (N.D. Tex. Feb. 27, 2001) ("In cases such as this one, where the technology is accessible to the court and the claims are relatively straightforward, a Markman hearing is unnecessary.").

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

defendant in his answer to the complaint (Document 45).

17.    Defendant's First affirmative defense is of Non-Infringement and it has one element: that the defendants actions as alleged by the Plaintiff's complaint are true but that those actions are non-infringing on the Plaintiffs patent '890. Thus, the defendant bears the burden of establishing that the evidence he holds proves his affirmative defense of non-infringement. A defense of patent non-infringement must be proven by a preponderance of the evidence.[5] Summary judgment on the issue of Infringement or Non-infringement is available in patent litigation.[6]

18.    The documents presented by defendant during discovery show clearly that, except for the false declarations of two witnesses, defendant does not have any evidence at all to support his defense of Non-infringement. The first declaration is from Mr. Jeff Breidenbach, which is contained in Document 23-1 EXHIBIT P1. The second one is the Expert Report written Mr. William E. Kasdorf. EXHIBIT P2

## Plaintiff Is Entitled To Summary Judgment On Claims I and II
## Based On The defendant's First Affirmative Defense of No Patent Infringement

19.    Defendant alleges in his answer (Document 45) that his actions do not infringe patent '890 because the book files defendant sends to ODB to be printed and bound are not text files as described in the specifications of the '890 patent. The defendant argues that he uses instead PDF

---

5    Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 261 F.3d 1329, 1336 (Fed. Cir. 2001).

6    See, e.g., Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351 (Fed. Cir. 2006); Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. GmbH, 444 F.3d 1337, 1447 (Fed. Cir. 2006); Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1359–60 (Fed. Cir. 2006); Lawman Armor Corp. v. Winner Int'l, LLC, 437 F.3d 1383, 1384 (Fed. Cir. 2006); MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1353 (Fed. Cir. 2005); Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1081 (Fed. Cir. 2005); Nystrom v. TREX Co., 424 F.3d 1136, 1138 (Fed. Cir. 2005); Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1304–07 (Fed. Cir. 2005); Network Commerce, Inc. v. Microsoft Corp., 422 F.3d 1353, 1364 (Fed. Cir. 2005); Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C., 419 F.3d 1346, 1348–49 (Fed. Cir. 2005); Terlep v. Brinkmann Corp., 418 F.3d 1379, 1380 (Fed. Cir. 2005); Pause Tech., LLC v. TiVo, Inc., 419 F.3d 1326, 1336 (Fed. Cir. 2005); CollegeNet, Inc. v. ApplyYourself Inc., 418 F.3d 1225, 1236 (Fed. Cir. 2005); Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1317 (Fed. Cir. 2005); Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1379–80 (Fed. Cir. 2004).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

files that contain only rasterised files. (EXHIBIT L, Page 2, first paragraph, and Document 23 Page 3, first paragraph) defendant further holds that said PDF files contain neither the words (text) of the book or the formatting instructions as described in the patent. Defendant believes that by simply denying that the Optical Character Recognition (OCR) file is included in the PDF file he avoids infringement, (stated in Document 23, page 4, second paragraph, and again in page 16, DECLARATION OF JEFF BREIDENBACH, EXHIBIT P1, and then again in the Expert Report written Mr. William E. Kasdorf. "The public domain book content PDF file transmitted from Google to ODB, like the public domain book content PDF files transmitted to any other person requesting one, contains only images of the scanned pages and does not contain textual data of the books. (EXHIBIT P2, page 8, second and third paragraph.).

20.    Plaintiff ('890 Patent Column 3, lines 20–25) and defendant (EXHIBIT P2, page 9, third paragraph) both have declared that Patent '890 describes a method for the process of storing, distributing and printing books on demand, and that such method is to store the contents of each book in a text file that is capable of a).- being searchable b).- containing both the content of a book either in text format for the words or in image format for pictures, and c).- containing also the formatting instructions on how the book pages are to be printed.

21.    It is therefore an undisputed fact.

22.    Defendant and his witnesses have further declared that defendant scans physical paper books and then performs what is known as an Optical Character Recognition (OCR) treatment to make all the words of each pages of the books searchable.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

23.     This is also an undisputed fact.

24.     The controversy lies in whether the PDF files sent by the defendant to ODB to be printed and bound contain a searchable text content (the words of the book).

25.     Plaintiff holds that the PDF files that defendant distributes to ODB contain both the text content (the words) of the book, plus images, and this fact makes the PDF files meet the definition set in the specifications of the '890 patent.

26.     Defendant and his witnesses have declared under oath that the OCR file produced with each book, which holds the word content of that book and makes it searchable because it contains the same words as those in the pages of the book, is "never included" and is kept separate from the PDF book files that are sent to be printed and bound. Moreover they have declared that the PDF files of the book themselves do not contain any text characters, and even less the words of the book. Moreover, defendant alleges that the PDF book files they store and send to be printed and bound on demand contain **_ONLY_** image files without any formatting instructions.

27.     The first witness Declaration under oath is from Mr. Jeff Breidenbach contained in Document 23-1 EXHIBIT P1.

> "Those public domain PDP files that Google Books provides contain no symbolic text layer or fonts. The PDP files contain only raster images from scanned pages, and do not contain text obtained through optical character recognition ("OCR")." Document 23-1, Paragraph 3.

28.     The second witness Declaration under oath is from the Expert Witness Report of Mr. William E. Kasdorf.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

"The reason one can "search"—as distinct from "search for"—the content of these books on the Google website is that Google has performed a process known as OCR, or Optical Character Recognition, on the images of the book pages, which creates separate data that is searchable as part of a Google search. Google also derives and stores information about the page geometry of the original page. This separate search data and derived page geometry information is not delivered to ODB; instead, only the PDF containing the page images is delivered to ODB. ( ***Expert Report of Mr. William E. Kasdorf,*** EXHIBIT P2, Page 8, section 3, second paragraph.

29.    As part of the Declaration of Mr. Jeff Breidenbach, defendant filed in court three book PDF files labeled "Exhibits A, B, and C". Those PDF book files were selected and provided by Mr. Jeff Breidenbach himself. (Document 23-1, Paragraph 4. EXHIBIT P1)

"4. Three examples of such PDF files from Google Books are attached as Exhibits A, B, and C. Exhibit A is a copy of Albert Einstein's Relativity: The Special and General Theory (1920). Exhibit B is a copy of Grimm's Fairy Tales (Volume I, 1892). Exhibit C is a copy of Machiavelli's The Prince (1903).

30.    Afterward, as part of discovery defendant sent to Plaintiff those same three PDF book files in a CD dated September 11, 2012. defendant challenged Plaintiff to discover in those files *any of the words of the book,* or any of the formatting instructions that are described by the patent-in-suit. That CD dated September 11, 2012 sent by the defendant is filed also herein as EXHIBIT I (CD).

31.    Plaintiff accepted to perform a Scientific Test on those files.

### Elements That Cannot Be Proven By The Defendant

32.    In view of the results of the Scientific Test he performed, Plaintiff affirms conclusively that defendant cannot demonstrate a triable issue of fact that the PDF book files used by defendant contain only rasterised images of the pages of the books, because the irrefutable and

10

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

conclusive evidence presented herein shows without any possible doubt that the truth is exactly

the contrary. "The moving party may meet its initial burden by either providing evidence that

negates an essential element of the opposing party's case or by showing that there is no material

issue of fact and that the nonmoving party will be unable to prove an essential element of its

case.[7]

33.    After performing a scientific test on all three books provided by defendant, **Plaintiff
found without any problem all the text words and formatting instructions as described and
protected by the '890 patent.**

34.    Plaintiff provides hereby irrefutable and conclusive evidence that defendants affirmative

defense and allegations are completely bogus, that both his witnesses committed perjury, and that

the PDF files the defendant sends to ODB to be printed and bound indeed **include all the words
of the book and the formatting instructions as defined in the '890 patent.**

## Plaintiffs Evidence Presented as Rebuttal for Defendant's First Affirmative Defense

35.    Pursuant to FRCP Rule 56(a)(1)(B), Plaintiff introduces herein evidence to rebut the

defendant's evidence. The rebuttal evidence is based in scientific tests performed on undisputed

evidence files that were provided by the defendant to this court, attached to the Declaration under

oath of Jeff Breidenbach (Doc. 23-1 EXHIBIT P1), and delivered to Plaintiff during discovery

(EXHIBIT I CD).

---

7    Vivid Techs., Inc. v. Am. Science & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) at 807.

## SCIENTIFIC TEST ON GOOGLE BOOKS' PDF FILES

36.      A main condition of a scientific test is that it must be reproducible and verifiable.

> "Testing and experimentation can occur in the laboratory, in the field, on the blackboard, or the computer. **Results of testing must be reproducible and verifiable**. The data should be available to determine if the interpretations are unbiased and free from prejudice." *Nature of Science and the Scientific Method*. Geological Society of America[8] EXHIBIT K, page 4, 1st column, second paragraph.

37.      The test described herein may be performed independently by *anyone, anywhere and at any time*, using their own computer and any of the files that that have been provided by the defendant as evidence which is on record.

38.      Expert evidence is not necessary to support summary judgment motions in patent cases where the technology is "'easily understandable without the need for expert explanatory testimony."[9]

39.      Furthermore, Federal Rule of Civil Procedure 56(c)4, requires that "supporting affidavits must be made on personal knowledge, show that the affiant is competent to testify, and set forth facts that would be admissible at trial."[10]

40.      Victor Celorio complete affidavit, with the Scientific Test results, is herein included as EXHIBIT J.

---

8   http://www.geosociety.org/educate/natureOfScience.htm

9   Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004), cert. Denied, 126 S. Ct. 337, 163 L. Ed. 2d 49 (2005) (quoting Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984)); see also Prima Tekil, L.L.C. v. Polypap, S.A.R.L., 412 F.3d 1284, 1290 n.7 (Fed. Cir. 2005) ("Expert testimony was not required, the technology being easily understood without expert testimony."); Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1323 n.3 (Fed. Cir. 2004).

10  Federal Rule of Civil Procedure 56(c)(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

41.    Victor Celorio declares in his affidavit that the tests described forthwith were made based on his personal knowledge of at least 25 years of programming computers in different languages, of printing and graphic design and robotics technologies. That he is competent to testify, and that he is setting forth facts admissible at trial as rebuttal against evidence presented by the defendant, according to Federal Rule 26(A)(ii)[11] and 26(2)(D)(ii)[12].

### Tests of Google Books PDF files

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dept.,* 535 F.3d 621 (7th Cir. July 25, 2008) United States Court of Appeals For the Seventh Circuit. 'Impeachment is an attack on the credibility of a witness, whereas rebuttal testimony is offered to explain, repel, counteract, or disprove evidence of the adverse party.' Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir. 1992).

42.    For these tests Celorio used the following three files delivered during Discovery by the defendant in a CD dated September 11, 2012: GOO006355.pdf, GOO006508.pdf, GOO006705.pdf. (EXHIBIT I CD).

43.    First he started the test with the book file GOO006705.pdf.

44.    He copied the original book files from the CD defendant Google delivered during discovery, and saved the copy in an independent folder for each book.

45.    An expedient way to find out if a file has any text characters, is by simply opening the

---

11  Federal Rule of Civil Procedure 26(A)(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, **unless the use would be solely for impeachment;**

12  Federal Rule of Civil Procedure 26(2)(D)(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

file with a program capable of reading text characters. This is an undisputed way of opening files

to see their contents, according to computer scientists and programmers around the world. See

University of Maryland Computer Science Department <u>EXHIBIT M</u>.

> "While most people prefer to view files through a text editor, you can only conveniently view
> ASCII files this way." Ascii vs. Binary Files[13] University of Maryland Computer Science
> Department

46.   Usually a text file is opened with the program Notepad, which is traditionally included

with the Windows operating environment.

> An ASCII file is defined as a file that consists of ASCII characters. It's usually created by using a
> text editor like emacs, pico, vi, Notepad, etc. There are fancier editors out there for writing code,
> but they may not always save it as ASCII. *Id*

47.   However the Notepad software does not have the capacity to open very large files. So

Celorio used WordPad instead because it is a fairly simple and neutral text file editor and is

readily available in most computers under the Windows environment. As long as the opened file

is not saved at any moment using the WordPad software, the original file will remain perfectly

safe and intact.

48.   Celorio then clicked on open and a window to choose the file came up.

49.   For WordPad to be able to "*see*" the .pdf files stored on the computer, Celorio needed to

change the type of files in the file selector of the WordPad, which is at the bottom right of the

Open File window.

---

13  University of Maryland Computer Science Department
    ( http://www.cs.umd.edu/class/sum2003/cmsc311/Notes/BitOp/asciiBin.html)

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG



50.     Celorio selected the option All Documents (*.*). Then Celorio selected the folder where he had previously saved the copy of the Google Book. Celorio choose first the Google Book GOO006705.pdf file. After Celorio clicked open, the file took about 15 second to load. The lower left part of the WordPad window described the percentage of the file as it loaded.

51.     What Celorio saw in the first page was this:

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

```
%PDF-1.6
%âãÏÓ
546 0 obj <</Linearised 1/L 5024297/O 545/E 748076/N 129/T
5013329/H [ 576 666]>>
endobj

xref
546 14
0000000016 00000 n
0000001242 00000 n
0000001307 00000 n
0000001581 00000 n
0000001645 00000 n
0000002350 00000 n
0000003061 00000 n
0000003767 00000 n
0000004484 00000 n
0000005195 00000 n
0000005861 00000 n
0000006517 00000 n
0000007225 00000 n
0000007576 00000 n
trailer
<</Size 560/Prev 5013317/Root 547 0 R/Info 545 0 R/ID
[<71A5D0CA6541C441819C4BF369DFDBFC>
<CE54C22DC5421C47599D58A123D071D77>]>>
startxref
0
%%EOF

555 0 obj<</Length 553/Filter/FlateDecode/I 1345/S 955>>stream
xÚb```f``'jd'a''TÁ Áê "
Œ
  §qŽ--
ÁÔe...! <Ç
†‚!~¦‡!1.†¤¡0è ...Œ]0_ÇH!dX+!n0Ò1
.P¬Ü¦a°iQ–.0Üz5d¸sP_04 66.é?9Y¦L¬îÜw¦b=[•ÁihÍŒ¦¯#ø0Zü
w\gÛ7ªZDÍ•—J%¦•†iH‡¡•Y'Í Îe œ¯z–Û zÄ67†i¬Îe
ª0Ç»2]5?-¯u c0...L{Ík ô5à-o¯Ðíq¬ m6q¥¦¦{ÐwáîngÙ% à ôzÁî
P¼
é¯9(?¯<£ œ .ÈÌÁ'¸7{Ì†Ò
œÖ-¦=¦Æ6¦{ŒÖœ¸¼ŒÖÎ¦œÖzs@
¯Óîaàñ\fÍ? ¦¿zÐ4¯¦•èùCÕÍfÍª   zÑz£fÍ.c+ O¦Ðé=CW?Û..._Ïf0¯Í¦ÍÍ¯¦µ¼cWÁd
{Í¾ûœà¦@îd¦sbR¯¦...ÔÜ¦é-
```

52.    Initially it looks strange, but on a closer look it is only a description of the contents of the file using text characters, the same text characters that the so called experts from Google denied that exist in the PDF file. It is in a programming code, of course, but the code itself uses text characters.

53.    Then Celorio clicked on the Find button of WordPad and Celorio searched for *the words*

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

*of the book itself.*

54.    The title of the book is The Prince, by Nicolas Machiavelli. So Celorio searched for the

word *Prince*. And it was found immediately. Here is the screen image:

```
12 0 0 7 113 273 Tm
(XT.TTT)Tj
14 0 0 13 80 248 Tm
(THE)Tj
14 0 0 12 119 248 Tm
(PRINCE)Tj
6 0 0 6 123 224 Tm
(BY)Tj
8 0 0 7 73 209 Tm
[(NICCCLO)-1194(MACHIAVELLI)]TJ
14 0 0 11 103 5 Tm
(G0000671}Tj
ET
q
264 0 0 439 0 0 cm
/Im0 Do
Q

endstream
endobj
27 0 obj<</Subtype/Image/Length
2946/Filter/CCITTFaxDecode/Name/X/BitsPerComponent .
1/ColorSpace/DeviceGray/Width 1102/DecodeParms<</K -1/Columns
1102/Rows 1030/Colors 1>>/Height 1030/Type/XObject>>stream
```

55.    Next Celorio searched for more words he selected from the book. Celorio chose words

that are not common. Celorio first searched for Ludovico.

```
0 Tc 0 Tw 0  Ts 100   Tz 0 Tr 8 0 0 7 83 399 Tm
[(NICCOLO)-1069(MACHIAVELLI)]TJ
7 0 0 5 42 383 Tm
[(Ludovico)-1427(alone)]TJ
6 0 0 5 102 382 Tm
(were)Tj
7 0 0 4 122 383 Tm
(sufficient)Tj
5.286 -0.25 Td
(to)Tj
7 0 0 5 171 383 Tm
(take)Tj
```

56.    Then Celorio searched for annexation, averse, Brittany, France,

17

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

```
.----..--
8 0 0 5 172 315 Tm
[(of)-541(the)]TJ
9 0 0 5 199 314 Tm
(rebellion)Tj
7 0 0 4 42 307 Tm
(less)Tj
6 0 0 4 61 306 Tm
(averse)Tj
7 0 0 4 89 306 Tm
(to)Tj
6 0 0 4 102 306 Tm
(secure)Tj
7 0 0 4 132 307 Tm
(his)Tj
2.286 -0.5 Td
(position)Tj
7 0 0 5 183 305 Tm
(by)Tj
8 0 0 5 197 305 Tm
(punishing)Tj
-19.375 -1.6 Td
(offenders)Tj
7 0 0 4 79 297 Tm
(investigating)Tj

(taken)Tj
3.429 -0.2 Td
(by)Tj
8 0 0 5 93 163 Tm
(the)Tj
9 0 0 6 109 161 Tm
(King)Tj
7 0 0 4 131 163 Tm
(of)Tj
7 0 0 5 142 163 Tm
(France)Tj
7 0 0 6 179 163 Tm
(Be)Tj
9 0 0 3 191 163 Tm
(it)Tj
7 0 0 5 200 162 Tm
(observed)Tj
8 0 0 5 43 153 Tm
(therefore)Tj
7 0 0 4 81 155 Tm
(that)Tj
6 0 0 4 99 155 Tm
... ...
```

```
(case)Tj
7 0 0 4 141 70 Tm
(of)Tj
8 0 0 6 154 69 Tm
(Burgundy)Tj
9 0 0 5 200 69 Tm
(Brittany)Tj
7 0 0 6 43 60 Tm
(Gascony)Tj
6 0 0 5 79 62 Tm
(and)Tj
7 0 0 6 96 60 Tm
(Normandy)Tj
7 0 0 5 141 62 Tm
(which)Tj
6 0 0 5 167 61 Tm
(have)Tj
3.333 0.2 Td
(been)Tj
5 0 0 4 207 61 Tm
(so)Tj
8 0 0 5 218 60 Tm
(long)Tj
.. .... ... - -
.------,--
3.667 -0.25 Td
(states)Tj
7 0 0 5 144 155 Tm
(which)Tj
6 0 0 5 168 154 Tm
(on)Tj
7 0 0 5 180 155 Tm
(annexation)Tj
6 0 0 4 223 154 Tm
(are)Tj
8 0 0 5 43 146 Tm
(united)Tj
7 0 0 4 71 146 Tm
(to)Tj
6 0 0 4 90 144 Tm
(previously)Tj
7 0 0 4 133 145 Tm
(existing)Tj
6 0 0 4 166 146 Tm
(state)Tj
```

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

57.     They are all there: each word of the book is embedded as text in the PDF file. Celorio

finds them all. The entire book, word by word, in text format.

58.     Then Celorio searched for the word Font, and Celorio found this in each 'page' of the

PDF file:

```
| ¦ ^–·₁ ¦ (–U–¦–– ·
↑F Õ ""ƒO > Á█Å5  – Î¦Nå
endstream
endobj
547 0 obj<</Metadata 544 0 R/Pages 513 0 R/Type/Catalog>>
endobj|
548 0 obj<</CropBox[0.0 0.0 612.0 807.0]/Parent 515 0 R/Contents
[550 0 R 551 0 R 552 0 R 553 0 R 554 0 R 555 0 R 556 0 R 557 0
R]/Rotate 0/MediaBox[0.0 0.0 612.0 807.0]/Resources<</XObject
<</Im0 558 0 R>>/Font<</T1_0 549 0 R>>/ProcSet
[/PDF/Text/ImageC]>>/Type/Page>>
endobj
549 0 obj<</Subtype/Type1/BaseFont/Helvetica/Type/Font>>
endobj
550 0 obj<</Length 635/Filter/FlateDecode>>stream
H%tTM  >0¶¼6+¦Ü 'ú‖Ìµ–*=s< *š€‹Þ%82$iúëk÷ðG¶ÕJYÉÅø½73~¦@ó$»
         ²¯Üò¥B¿ @ :g†T· «‡ù Õ¹+´ẏẏØ#
↑tLJ *@A
á'½}S»ê=3g₇Å p‹◄è Õ
Å‚Üa

òₜtPÕÉÉB¹ƒ█  z€…Cmí<¢♫he'¢z█h♫
nÐÂ¦ °>"b‡ú+Õừ"ÅJB¦Û
9)ð◄03↑
¬¹¯ç„ç₁ ₁QO 2Å
æÛₜj1 }¦ẏ Áð
```

59.     Those are the formatting instructions for each page of the pdf book file.

60.     In summary, all of the text words and formatting instructions that both the defendant and

his witnesses have declared under oath that a PDF file does not have.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

## Corroborating Test

61.   Celorio then closed that PDF file and opened the other two Google Book PDF files provided by the defendant: GOO006355.pdf, and GOO006508.pdf.

62.   In all of them the results were equally conclusive: the three files contain all the words of the corresponding book, and the formatting instructions. The irrefutable results of the all the tests are included in EXHIBIT O.

63.   Finally Celorio closed WordPad and reopened each PDF file with the corresponding software Adobe Reader to make sure the files were not damaged at all.

64.   They all work perfectly.

65.   The results of the tests prove conclusively and beyond a doubt that defendant has tried to grossly and cynically mislead this court and that the witnesses have committed perjury by denying that the PDF files contained the text (words) of the books.

66.   Plaintiff is entitled to Summary Judgment on Claim I and II of his Amended Complaint (Document 13) based on the complete lack of defendant's evidence to support its affirmative Defense of Non-Infringement.

## Plaintiff is entitled to Summary Judgment on Claim I and II based on the Defendant's Second Affirmative Defense - Invalidity.

67.   In the second of his affirmative defenses, defendant argues that the '890 patent is invalid.

68.   Burden of proof and elements: the defendant bears the burden of establishing the affirmative defense of Patent invalidity. This defense has one element: the invalidity of patent

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

'890, in three modalities:

> "under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art."
>
> "The claims of the '890 Patent are invalid and unenforceable under 35 U.S.L. § 103 because the claims are obvious in view of the prior art."
>
> "The claims of the '890 Patent are invalid and unenforceable for failure satisfy the conditions set forth in 35 D.S.C. § 112, including failure of written description, lack of enablement, and/or claim indefiniteness." Defendant's Answer to Complaint (Document 45)

## Standard of Law for Validity

69.     On June of 2011, in the ruling *Microsoft v. i4i Limited Partnership,* 131 S.Ct. 2238 (2011) the Supreme Court of the United States (10-290, June 9, 2011) established firmly the Standard of Law for a finding of Invalidity. The Court ratified that an issued patent has a "presumption of validity" and the only way of overcoming that presumption is by presenting "Clear and Convincing Evidence."

## Evidence of Invalidity

70.     Because a patent is presumed valid pursuant to 35 U.S.C. § 282, the party seeking to invalidate a patent claim has the burden to do so by clear and convincing evidence.[14]

71.     Thus, in the context of summary judgment, a non-moving party seeking to invalidate a patent bears the burden of proof and "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."[15]

---

14  Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378 (Fed. Cir. 2005); Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1326 (Fed. Cir. 2004); Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045–46 (Fed. Cir. 2001); Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983). This standard of proof applies equally in the summary judgment context. Nat'l Presto, 76 F.3d at 1189

15  Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

72.    The defendant in the instant case does not have any evidence at all to prove the invalidity

of the '890 patent. Moreover, defendant does not even have the evidence to prove the invalidity

of a *single claim* of the '890 patent, since defendant's evidence consists only of a couple of

promotional books and patents that contain mostly what is known as Old Art.


### Prior Art

73.    Prior art is defined by Title 35, United States Code, Section 102, which states in the

pertinent part: "A person shall be entitled to a patent unless...."()"the invention was patented or

described in a printed publication in this or a foreign country or in public use or on sale in this

country, more than one year prior to the date of the application for patent in the United States."

74.    If a prior art document does not describe all the elements of a claim, that claim is said

to be novel compared to the document.[16] "A claim is anticipated only if each and every

element as set forth in the claim is found, either expressly or inherently described, in a single

prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2

USPQ2d 1051, 1053 (Fed. Cir. 1987)."

75.    Old Art is Prior Art that was already disclosed during the prosecution of the '890 patent.[17]


### Enabling disclosure

76.    Another requirement for a publication to qualify as prior art is that it must be enabling. In

---

16  "The identical invention must be shown in as complete detail as is contained in the ... claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d
1226, 1236, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989).

17  A "substantial new question of patentability" is not raised by the prior art if the Office has previously considered (in an earlier examination of
the patent) the same question of patentability as to a patent claim favorable to the patent owner *based on the same prior art patents or
printed publications*. In re Recreative Technologies, 83 F.3d 1394, 38 USPQ2d 1776 (Fed. Cir. 1996).

other words, the publication must enable an average skilled person to practice the invention as claimed.[18] A science-fiction novel might describe an invention without going into details. While this will describe the basic idea behind the invention, it does not enable the skilled person to construct the invention. For example, the famous *Star Trek* TV series features the so-called "transporter", by which Starfleet personnel could be "beamed down" to the surface of the planet. However, no details were ever given on how the transporter was supposed to work, or how anyone could build it. If someone today were to invent a working matter transporter that operated in exactly the same way as in Star Trek, he would still be able to obtain a patent on it. The disclosure given in the TV series would not be sufficient to destroy novelty of the features of his transporter.[19]

## References cited by Defendant as Prior Art

77.   The four referenced publications are promotional books or pamphlets. defendant tries to mislead the court by presenting two references that are not germane to the case because they were published *after* the priority date of the patent-in-suit. The copyright dates of two of those publications are *posterior* to the priority date of the '890 patent, which is October 1996. To qualify as prior art, a reference needs a publication date *more than one year prior to the date of*

---

18   The standard for determining whether the specification meets the enablement requirement was cast in the Supreme Court decision of *Mineral Separation v. Hyde*, 242 U.S. 261, 270 (1916) which postured the question: is the experimentation needed to practice the invention undue or unreasonabie? That standard is still the one to be applied. *In re Wands*, 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed. Cir. 1988). Accordingly, even though the statute does not use the term "undue experimentation," it has been interpreted to require that the claimed invention be enabled so that any person skilled in the art can make and use the invention without undue experimentation.

19   *In re Wands*, 858 F.2d at 737, 8 USPQ2d at 1404 (Fed. Cir. 1988). See also *United States v. Telectronics, Inc.*, 857 F.2d 778, 785, 8 USPQ2d 1217, 1223 (Fed. Cir. 1988) ("The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation.")

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

*the application for patent in the United States,*[20] which is October 1995.

78.     The referenced publications are as follows:

> The Power of Print on Demand, Xerox Corp., **Copyright 1994**, (hereinafter "XEROX.")
> EXHIBIT U1

> On-Demand Printing: The Revolution in Digital and Customized Printing, Howard M. Fenton and
> Frank J. Romano, **Copyright 1995**, (hereinafter "FENTON AND ROMANO.") EXHIBIT U2

79.     The reference XEROX shows a Copyright of 1994 (EXHIBIT U1). However, since
Copyright is assigned well in advance of the publication of the book, it follows that the
publication date itself is posterior to that date. The Library of Congress shows that XEROX was
included in the Catalog until 1997 (EXHIBIT E3).

80.     The FENTON AND ROMANO reference shows a copyright of 1995. Google itself lists
this book as being published in 1997[21] (EXHIBIT E1). The Library of Congress shows that this
title was included in the catalog on 04-04-96[22] (EXHIBIT E2, page 2, first paragraph). Therefore,
the exact publication date of both XEROX and FENTON AND ROMANO is not clear at all.

### References Published After The Priority Date

> Jim Hamilton, The Print-on-Demand Opportunity: Technology, Products & the Business,
> **Copyright 1996**, (hereinafter "CAP"). EXHIBIT U3

> Jim Wallace, Exploring IBM Print On Demand Technology, **Copyright 1997**,
> (hereinafter "WALLACE." ) EXHIBIT U4

---

20  Title 35, United States Code, Section 102, which states: "A person shall be entitled to a patent unless...."()"the invention was patented or
    described in a printed publication in this or a foreign country or in public use or on sale in this country, *more than one year prior to the date
    of the application for patent in the United States.*"

21  http://books.google.com/books/about/On_demand_printing.html?id=iGEc3pPSTFUC

22  http://catalog2.loc.gov/vwebv/staffView?searchId=92299&recPointer=0&recCount=100&bibId=3036981

24

81.    Moreover, besides the publication date problems, three of the four references, published in different years, (XEROX, FENTON AND ROMANO and CAP), focus on the same brand of laser printers: the DocuTech. That line of laser printers is explored in depth by FENTON AND ROMANO.

82.    The WALLACE reference concentrates and explores in depth the dozen or so models of laser printers manufactured by IBM.

83.        The main subject of all of the references are the *laser printers* manufactured either by XEROX (DocuTech) or by IBM (many models). Laser printers are Old Art because they were disclosed in the prosecution of the '890 patent and they are mentioned in the specifications. (EXHIBIT A, Column 7, line 21).[23] Moreover, the laser printers mentioned in the referenced publications work only with scanned (rasterised) documents, such as those disclosed as Prior Art in the '890. "This raster image is acquired by copying a book which has already been printed, for example in the traditional way. As is well known, a raster image (bit-map) 20 is akin to a photograph." '890 EXHIBIT A, Column 2, lines 17 to 20.

84.    Moreover, in the FENTON AND ROMANO publication, the authors expressly describe that those Docutech laser printers *do not have* the capacity to handle text files, as provided by the '890. The laser printers described do NOT have any text editing capacities. *"there are not text creation or editing features..."* in the DocuTech. EXHIBIT U2 FENTON AND ROMANO in page 119, sixth paragraph.

---

23  "Once the temporary type memory, for example a hard drive, inside the remote electronic bookstore 2 receives the electronic text, or while it is still receiving, through remote printing commands it can send electronic signals representing the text to be printed to 20 a printing means 8, for example, a laser printer. The printing means is preferably located within the REB housing." Patent '890, Column 7, 16 to 22

85.   And since XEROX and CAP describe the same printers, this limitation applies to those publications also.

86.   There is another problem with the evidence presented by the defendant: the referenced publications do not teach extensively *anything* about printing and binding books.

87.   They teach about printing paper.

88.   Laser printers print paper and the referenced publications teach extensively about the capacity of those printers to print paper. The binding of that paper into books is a very minor issue in all of those publications: this can be corroborated by the space dedicated in each one to the subject of binding books: a few lines, *if any*, in dedicated works which are at least over a hundred pages long each.

89.   The binding of that paper into a book is mentioned in the referenced publications by describing summarily how the laser printers owners may purchase third-party equipment to bind the paper.

90.   Either individually, or combined, none of the referenced publications describe an integrated printing and binding device and method such as the one disclosed by the '890, because none of them have it: it didn't exist.

91.   This fact is corroborated by the hundreds of articles written about the invention of the '890, in which the printing industry at the time welcomes the '890 technology as *a first* in its class.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

## Patents cited as Prior Art by Defendant

92.    Rosenberg, US 3,575,501 ("ROSENBERG") (EXHIBIT V-GOO004212): from Meyer, Jr.

et al. US 4,140,733 ("MEYER") (EXHIBIT V-GOO004218); Lewis US 4,653,972 ("LEWIS")

(EXHIBIT V-GOO004223), AND Ross US 5,465,213 ( "ROSS") (EXHIBIT V-GOO004230).

93.    The ROSS patent was already extensively referenced as prior art during the prosecution

of the '890, (EXHIBIT A, Column 2, to 47), so it is Old Art that has the added burden of

challenging the USPTO. "Where the matter alleged to be invalidating was expressly considered

by the PTO, the party challenging validity has the "added burden ... of overcoming the deference

that is due to a qualified government agency presumed to have properly done its job, which

includes one or more examiners who are assumed to have some expertise in interpreting the

references and to be familiar with their work with the level of skill in the art and whose duty it is

to issue only valid patents." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359

(Fed.Cir.1984).

94.    Moreover, the ROSS Patent went through a couple of Reexamination at the USPTO

which resulted in all of the claims of that patent declared invalid. defendant has the certificate of

reexamination in EXHIBIT VGOO000433.

## MEYER Patent Teaches Away

95.    MEYER mentions aqueous adhesives, while *teaching away from them*:

> "Such glues are generally of animal origin and are in limited supply. Also, the water in the
> adhesive must be absorbed or evaporated, requiring a period of time for the glue to set before the
> books and magazines can be distributed. Also, a considerable amount of energy can be expended

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

in disposing of the water in the glue. Hot-melt adhesive which eliminate the problem of eliminating the water and which have a faster set-up time have been developed." Meyer, Column 1, lines 15 to 25.

96.     Therefore MEYER cannot be used as a combination to meet any of the claims in the '890 because: "It is improper to combine references where the references teach away from their combination." *In re Grasselli*, 713 F.2d 731, 743, 218 USPQ 769, 779 (Fed. Cir. 1983)

## LEWIS Is Old Art

97.     LEWIS discloses a manual book binding apparatus which uses chains, sprockets, etc., and three clamps to hold a book block. LEWIS's type of binding methods were already disclosed by the Patent '890:

| LEWIS | Patent '890 |
|---|---|
| LEWIS Col. 2, lines 10 to 13 | '890 Patent, Column 10, lines 11 to 17 |
| The loaded clamp 4 then travels 10 in the direction of the arrow x to the station B wherein means such as a rotating cutter *provide an appropriate roughened finish to the spine of the book to receive an adhesive.* | This is an improvement over the *traditional methods of roughening the spine after the book block is formed.* |

98.     Therefore LEWIS is Old Art, under *Hiniker Co.*, 150 F.3d 1362, 1365-66, 47 USPQ2d 1523, 1526 (Fed. Cir. 1998).

## ROSENBERG Is Old Art

99.     ROSENBERG doesn't describe any binding means, but instead rely on commercially

available and well known binding devices: "it will be noted that this method of folding, cutting and binding is similar to a presently known process applied in the paperback book industry." Rosenberg, Column 4, lines 73 to 75.

100.   The same type of commercial devices as those described as prior art in the '890. " It discloses the use of commercially available binding machines which mayor not work with the proposed system." '890, Column 2, line 37 to 40

101.   Therefore ROSENBERG is Old Art,, under *Hiniker Co*., 150 F.3d 1362, 1365-66, 47 USPQ2d 1523, 1526 (Fed. Cir. 1998).

## Unidentified Loose Sheets

102.   Defendant also includes as part of his evidence, loose sheets of paper claiming to be a Japanese Unexamined Patent Publication, but the sheets are written in English. (EXHIBIT V-GOO003406) Those sheets of paper do not show any clear information as to its origins and therefore it does not have any evidentiary validity because it does not meet Federal Rules of Evidence Rule 902 (3).

103.   Those sheets of paper also lacks a certified translation from the original Japanese to English.

104.   Furthermore, there are problems with the language that is used on those sheets, because it is supposed to have been applied for in Japan on the same year that the very first commercial

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

laser printers were being released in United States.[24] If FENTON AND ROMANO, who was published 10 years later, in 1996, expressly describes laser printers that didn't have the capacity to editing text files, as provided by the '890, it is very suspicious that the "Japanese" sheets make a explicitly mention of a function for printer technology that wasn't available at the time. So those sheets could very well be a forgery.

## Defendant's Evidence Cannot Prove Invalidity

105.   Even without the problems mentioned before, and considering the evidence viewed in the light most favorable to the nonmoving party[25], the references provided by defendant cannot by themselves, either alone or combined, meet the elements of any single one of the claims of the '890 patent.

106.   If a prior art document does not describe all the elements of a claim, that claim is said to be novel compared to the document. "The identical invention must be shown in as complete detail as is contained in the ... claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989).

## Expert Witness Mr. William E. Kasdorf.

107.   Mr. William E. Kasdorf, the so called Expert Witness that perjured himself when he swore that the defendant's PDF files did not include the words captured by the OCR, (EXHIBIT

---

24  The first laser printer designed for use in an office setting was released with the Xerox Star 8010 in 1981. Although it was innovative, the Star was an expensive (US$17 000) system that was purchased by only a few businesses and institutions. After personal computers became more widespread, the first laser printer intended for a mass market was the HP LaserJet 8ppm, released in 1984, using a Canon engine controlled by HP software. http://en.wikipedia.org/wiki/Laser_printing EXHIBIT Z

25  Bus. Objects, S.A. v. Microstrategy, Inc., 393 F.3d 1366, 1371–72 (Fed. Cir. 2005) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

P2, page 8, second and third paragraph), also makes wild and unsupported allegations about the USPTO not doing a proper job examining the '890 patent.

108.    But what makes the case of this Expert Witness uniquely worse and astonishingly absurd is that Mr. Kasdorf bases his diatribe on the reexamination case of a **DIFFERENT PATENT** that it was issued in 2001, *almost a year an a half AFTER the patent-in-suit*. That patent is not relevant at all to the instant case, and therefore is inadmissible.[26]

109.    Courts may preclude expert testimony that indicates that USPTO procedures are shoddy.[27] Courts view such testimony as an improper "attempt to undermine the presumption of validity under 35 U.S.C. § 282 by inviting the jury to speculate about possible defects, errors, or omissions in the application process that led to the issuance of the patent-in-suit."[28]

110.    "The first and most important element of the Rule 26 analysis is whether the report prepared by [the expert] contains a complete statement of his opinions and the basis for his opinions".[29] The statement must be complete and detailed—"sketchy" or "vague" statements will

---

26  Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. **Evidence which is not relevant is not admissible.**

27  See, e.g., Applied Materials, Inc. v. Advanced Semiconductors Materials Am., Inc., No. C 92-20643 RMW, 1995 WL 261407, at *3 (N.D. Cal. Apr. 25, 1995) (excluding expert testimony concerning overwork at the PTO and other matters insinuating that the PTO does not do its job properly as "irrelevant speculation"); Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F. Supp. 2d 252, 255–56 (W.D.N.Y. 2000) (ruling inadmissible testimony on "the problems Examiners encounter with the completeness or 'file integrity' of the 'shoes' maintained at the PTO," "the difficulties Examiners face in discovering and obtaining prior art references other than patents," and "the time constraints under which Examiners in the PTO must operate"; "generalized testimony about 'problems' in the PTO is not admissible").

28  Bausch & Lomb, 79 F. Supp. 2d at 255. See also, e.g., W. Elec. Co. Inc. v. Piezo Tech., Inc., 860 F.2d 428, 433 (Fed. Cir. 1988) ("It is no more appropriate to question a patent examiner's technical expertise than it is to question the quality of a judge's law school education or judicial experience."); Neutrino Dev. Corp. v. Sonosite, Inc., 410 F. Supp. 2d 529, 544 (S.D. Tex. 2006) ("The Court finds that, to the extent that [the expert's] testimony simply addresses the potential pressures and potential for error at the PTO, such testimony is inadmissible. Such general testimony tends to undermine the presumption of validity.") (citation omitted).

29  See Campbell v. McMillin, 83 F. Supp. 2d 761, 764 (S.D. Miss. 2000).

not suffice.[30] Conclusory and unsupported statements are likewise insufficient.[31] Courts disfavor reports providing opinions that something "could" have caused the harm at issue or that findings "suggest" a particular possibility.[32]

111. "[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." Phillips v. AWH Corp., 415 F. 3d 1303 - United States Court of Appeals, Federal Circuit (quoting Key Pharms., 161 F.3d at 716. )

## **Plaintiff's Objective Indicia Of Novelty**

112. In his Second Affirmative Defense - Patent Invalidity, the defendant states that "The claims of the '890 Patent are invalid and unenforceable under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art."

113. Defendant must prove invalidity through clear and convincing evidence that the claims of the '890 patent lack novelty. "Because a patent is presumed valid pursuant to 35 U.S.C. § 282, the party seeking to invalidate a patent claim has the burden to do so by clear and convincing

---

30  Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir. 1996).

31  See Campbell, 83 F. Supp. 2d at 765 (finding report inadequate because it merely offered conclusory allegations without providing the basis of the opinions); Reed, 165 F.R.D. at 430 n.11 ("[t]he insistence of Rule 26(a)(2)(B) on a 'complete statement of all opinions to be expressed and the basis and reasons therefore' has another salutary effect. Practitioners should no longer have to face what is referred to in the state courts as a 'net opinion.' This is defined as an expert's bare conclusion, unsupported by factual evidence").

32  See Campbell, 83 F. Supp. 2d at 764–65.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

evidence.[33]

114.   This standard of proof applies equally in the summary judgment context. *Nat'l Presto*, 76 F.3d at 1189.

115.   Thus, a party seeking to invalidate a patent bears the burden of proof and "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."[34]

116.   Defendant has failed to provide any evidence that meet all the elements of a single claim of the invention as is described in the '890 patent, much less clear and convincing evidence of patent invalidity. Furthermore, defendant does not provide any evidence at all of lack of novelty.

117.   Courts have ruled that any affirmative defense of "lack of novelty," can be rebutted by ***objective indicia*** of "commercial success, long felt but unsolved needs, [and] failure of others." *Graham v. John Deere Co.*, 383 U.S. at 17, 148 USPQ at 467. See also, e.g., *In re Piasecki,* 745 F.2d 1468, 1473, 223 USPQ 785, 788 (Fed. Cir. 1984).

118.   Such objective indicia of novelty is included herein, in <u>EXHIBIT Q</u>, in hundreds of articles written about the invention of the '890. Those articles were written at the time and around the world by professionals in the field of printing and binding books. There is not a single mention in any of those articles that even implies that the invention of the '890 is nothing but a new technical achievement.

---

33  Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378 (Fed. Cir. 2005); Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1326 (Fed. Cir. 2004); Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045–46 (Fed. Cir. 2001); Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983).

34  Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

119.   All of the press articles regard the invention as the "First" in its class. EXHIBIT Q.

120.   One of those in depth articles was published by THE SEYBOLD REPORT, which for more than 40 years has been considered the industry standard and the best review of the printing industry in the US EXHIBIT T, First page. That article wrote in depth about the invention.

## **Sample Of Article References**

**THE SEYBOLD REPORT**

Someday, your local bookstore may be able to print a copy of any book you want, while you wait. There are significant obstacles to that vision, but one big one—the need for an inexpensive, reliable and easy-to-use printing and binding system—is being solved. ***This article describes the first system to make it into the field.***

There's a very good chance that, within the next few years, you'll be able to walk into your local bookstore and have a copy of a book printed on the spot. If that comes to pass, it will be because of the work of a few visionary companies that developed the necessary technology. One of those companies, ***and the first to actually have a machine in a bookstore,*** is the InstaBook Corporation. The InstaBook Maker: Book Printing Eases into the Bookstore (June 3, 2002 • The Seybold Report • Analyzing Publishing Technologies • © 2002 Seybold Publications) EXHIBIT T First page.

An engineering challenge. With all of these benefits, why hasn't the production of books in the bookstore happened yet? Two reasons. First, the right machine for printing books on demand has not been available. Such a machine needs to be affordable enough, reliable enough, and easy enough to use in order to fit into a bookstore environment. It needs to produce books that satisfy the expectations of bookstore customers. And it needs to achieve a low enough cost per book to be able to compete with books produced through the traditional process. Until last year, no such machine had ever made it out of R&D and into a bookstore. The InstaBook Maker: Book Printing Eases into the Bookstore The Seybold Report, Vol. 2 No. 6: Book Printing Eases into the Bookstore The Seybold Report, Vol. 2 No. 6: First page.

*///////*

**Technology Breathes Life into Print | Source Code | May 17 1999**

One company on the cutting edge of technology is InstaBook Corp., based in Gainesville, Fla. For book publishers, the new technology heralds a time when no book will be printed before it's sold. Individual books can be made to order on laser printers that could easily fit in the corner of your favorite book store, your neighborhood Kinko's or even at an airport kiosk. The cost of printing a standard paperback would be as little as $2.  Source Code | May 17 1999, Next to last paragraph |. EXHIBIT T9

*///////////*

**A Prediction Disguised as a Story | Marshall Masters | November, 2003**

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

This fictional account set in the future is based on present-day fact. Although I invented the term On Time Publishing, a system like the one described in the story is now operational.

It's a retail POD-type system invented by InstaBook founder Victor Celorio. The first InstaBook brick-and-mortar retail outlet is now open for business in Ontario, Canada, and you can learn more about this futuristic publishing technology by visiting www.instabook.net Jenny's Digital Book Nook: A Prediction Disguised as a Story Marshall Masters November, 2003 | EXHIBIT T2

//////////

### American Digest, May 10, 2004

Beginning next week, Bookends in Ridgewood, N.J. Will be a POD guinea pig, as it were, when it becomes the first U.S. Bookseller to install an InstaBook machine, which allows for on-demand printing of trade paperbacks. American Digest, May 10, 2004, first paragraph EXHIBIT T4

/////

### American Booksellers Association | May 05, 2004

In the time you may spend browsing in a bookstore for the right book, you can now publish one of your own. With advances in Print-On-Demand (POD) technology, the equipment is easy, fast, and small enough to operate in a 5,000-square-foot bookstore. Bookends, a Ridgewood, New Jersey, mainstay for two decades, recently launched BooksByBookends, which utilizes the patented InstaBook machine to print and perfect-bind 10 copies of a book, including cover, in the bookstore in less than an hour. Multiple copies of original manuscripts can be printed, as well as single copies of thousands of classics available from BooksByBookends. American Booksellers Association | May 05, 2004, first paragraph, EXHIBIT T3

//////

### The Library of the Future: The Impact of Computer Technology on Traditional Library Services

In such cases, one-off copies of electronic texts can be printed and bound by high-speed machines like those offered by InstaBook. Page 7, Content – Books – Print-on-Demand Yet another variation of acquisition-on-demand is print-on-demand. In this model, content may be stored by the library on its own or its vendor's server and printed on demand by a device such as the InstaBook printer/binder[37]. The Library of the Future: The Impact of Computer Technology on Traditional Library Services- Technology and Society (Fall 2000) Thomas College, Waterville, Maine, By Stephen LaRochelle 30 November 2000, pages 7 and 8 EXHIBIT T5

////

### The New York Times, EDITORIAL OBSERVER, December 25, 2005

And now comes James Hyland, a figure from the distant history of our having shared in the military draft 49 years ago, popping up uninvited as a Web cookie and brandishing his high-tech memoir: **249 pages hot off the first instant book-printing machine to be**

**found in an American bookstore**. () The machine that published this memoir (it is available at www.booksbybookends.com) and a fast increasing number of other works - helixes of anybody's fact or fiction - is at Bookends, an otherwise harmless bookstore in Ridgewood, N.J. | Memory, Workmaid and Mother of the Muses, Hits the Print Button, By FRANCIS X. CLINES. <u>EXHIBIT T7</u>

////

### BooksByBookends: First In-Bookstore Print-On-Demand Self-Publishing System

BooksByBookends, a new self-publishing print-on-demand service -- the first in-store printing/publishing service in the United States -- is being offered at Bookends, a leading independent bookstore in Ridgewood, N.J. Authors can walk in with a manuscript on a disk or email it, and BooksByBookends will print the book on site, on the spot -- a trade paperback, perfect-bound, with a cover of the author's own design. FindLaw. May. 05, 2004 <u>EXHIBIT T6</u>

//////////

### Publisher's Weekly, Richard T. Scott, 1999

InstaBook Maker is available now. **"We are installing the first systems in publishers'** offices throughout the U.S.," said Celorio, adding that it is considerably smaller than the Book Machine of the On Demand Machine Company. He explained that everything, including printing of the text, of the cover, and binding the book is done in a 4-by-3-by-2.5-foot unit. "Everything is done in that space," he said. "That is why it is such a beauty." He added that a 200-page book can be "completed in a couple of minutes. If we consider the downloading time, it means that from the moment you click on the title you want, to have the finished product, you need around five minutes." To operate the InstaBook Maker, said Celorio, requires only ten minutes of training. — <u>EXHIBIT T8</u>

//////////

### For Budding Authors, a Rapid-Fire Publisher | New York Times | Technology Section

**''HOT off the presses'' has taken on a newly literal meaning with the installation of the first instant book-printing machine in an American bookstore.**

Take a floppy disk or CD-ROM to Bookends in Ridgewood, N.J., or e-mail the store a file, and pow! -- in as little as 17 minutes a perfect-bound paperback version of your novel, family memoir, or favorite Bulgarian desserts can be printed. Every book comes complete with a customized cover chosen from among several thousand designs. For an additional fee, it can also be trademarked and registered with a machinereadable ISBN number, essential for any author hoping to get the work stocked by a major chain and on its way to becoming a best seller. New York Times | Technology Section, Published: June 10, 2004, First Paragraph, <u>EXHIBIT T10</u>

////////

### When We Are All Publishers: NJ Indie Is Insta-B&N

Beginning next week, Barnes & Noble won't be the only bookstore publishing public-domain classics. Walter Boyer, who owns the indie Bookends in Ridgewood, N.J., will be publishing several thousand via his own store. And unlike B&N, he'll be making them available on-demand.

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

**Bookends is the first American bookseller** to install an InstaBook machine, which allows for on-demand printing of trade paperbacks. (Several have previously been placed in Canada stores.) Publishers Weekly, Tuesday, April 27, 2004 EXHIBIT T11

/////

## Plaintiff's Objective Indicia Of Non-Obviousness

121.    Also in his Second Affirmative Defense - Patent Invalidity, the defendant states that "The claims of the '890 Patent are invalid and unenforceable under 35 U.S.L. § 103 because the claims are obvious in view of the prior art."

122.    While the ultimate determination of invalidity based on obviousness under 35 U.S.C. § 103 is a legal issue for the court, it is based on subsidiary factual issues. "This statutory test requires factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness. *Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1336 (Fed. Cir. 2010).[35]

123.    Evidence related to the patentee's invention can be relevant to secondary considerations of nonobviousness and, in particular, commercial success. See *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

124.    The Federal Circuit noted that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

125.    Where the underlying factual issues are not in dispute, summary judgment may be

---

35  See also *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

appropriate even if the ultimate legal conclusion of obviousness is disputed.[36]

## Commercial Success Of The Patented Invention

126.    Plaintiff presents irrefutable evidence of such success with sales that reached over a

million dollars per year ($1,205,417 in 2007) (EXHIBIT R2007 CONFIDENTIAL).

127.    Furthermore, "Expert opinions regarding the level of skill in the art are probative of the

Nonobviousness of the claimed invention." *In re Oelrich,* 579 F.2d 86, 91-92, 198 USPQ 210,

214 (CCPA 1978), *Piasecki,* 745 F.2d at 1471, 1473-74, 223 USPQ at 790"

128.    The expert opinions comes from two encyclopedias of digital printing. One is *The*

*Handbook of Digital Publishing,* published by Prentice Hall in the year 2000, which is one of the

highest references of specialized scrutiny of the printing industry available in the world.

Moreover, the person writing the foreword is precisely *the* FRANK ROMANO, who wrote one

of the references that was produced as evidence of Prior Art by the defendant (FENTON AND

ROMANO). EXHIBIT S, page 3, first column, first paragraph.

> "The InstaBook Maker I is **"The World's first system that makes perfect-bound books in one**
> **simple step"**. The self-contained book production system requires less that ten square feet of floor
> space, and produces a finished book at the rate of approximately one book per minute. The user
> simply attaches his or her computer and sends her PostScript or non-PostScript files. Books as
> thick as 4" can be produced. .

129.    The other entry is in *The Columbia Guide to Digital Publishing,* published by

Columbia University Press, in the year 2003, EDITED BY THE EXPERT WITNESS FOR

THE DEFENDANT HIMSELF. It seems that the payment for his services of 2012, made him

---

36  ID

forget that he considered the invention novel an a "formidable"  engineering challange in

2003. (EXHIBIT S, Page 5, third paragraph).

> "As of late 2002, **there is only one actual case of a book production device being installed in a
> bookstore -the machine is made by the InstaBook Corporation**. () **The engineering challange
> of creating a self-contained book-production machine is formidable**..." The Columbia Guide to
> Digital Publishing, published by Columbia University Press, in the year 2003, Page 379.

130.   Both of those works are exhaustively researched and highly respected encyclopedias of
the new technologies of printing.

131.   The defendant cannot prove his Defense of obviousness with the evidence he has, and is
incapable of defeating all of these contemporary sources from hundreds of professionals in the
field of printing, which demonstrate with clear and convincing evidence that the invention
described in the '890 was indeed new and completely far from obvious in a very competitive
field,[37] with false witnesses. "It is difficult but necessary that the decisionmaker forget what he or
she has been taught . . . about the claimed invention and cast the mind back to the time the
invention was made (often as here many years), to occupy the mind of one skilled in the art."
*W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 220 USPQ 303, 313 (Fed. Cir.
1983), cert. denied, 469 U.S. 851 (1984).

## Affirmative Defense of failure of written description, lack of enablement, and/or claim indefiniteness

132.   In the last modality of his Defense of Invalidity, defendant states that

---

37 "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 718, 21 USPQ2d 1053, 1057 (Fed. Cir. 1991). The examiner must ascertain what would have been obvious to one of ordinary skill in the art at the time the invention was made, and not to the inventor, a judge, a layman, those skilled in remote arts, or to geniuses in the art at hand. Environmental Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 218 USPQ 865 (Fed. Cir. 1983), cert. denied, 464 U.S. 1043 (1984).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

The claims of the '890 Patent are invalid and unenforceable for failure satisfy the conditions set forth in 35 D.S.C. § 112, including failure of written description, lack of enablement, and/or claim indefiniteness.

133.   Invalidity for lack of written description under 35 U.S.C. § 112, ¶ 1, is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date, and not in hindsight.[38]

134.   Defendant has failed to provide **any evidence at all** as to this issue.

135.   Plaintiff on the contrary offers abundant evidence that proves defendants defense is bogus. EXHIBIT Y contains 46 pages that describe in detail the mode of infringement on each claim of the '890, with the precise reference to the written description and enablement of each one of the claims.

## Plaintiff's Evidence Of Willfulness

136.   "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed.Cir.2007). Stated another way, "proof of willfulness ... requires at least a showing of objective recklessness." Id. If this objective standard is satisfied, then the plaintiffs must establish the existence of a separate, subjective element—the risk that the defendant's conduct was objectively reckless "was either known or so obvious that it should have been known to the accused infringer." *Id.*

---

38  See Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991).

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

## Defendant Concealed Discoverable Information

137.    Plaintiff offers herewith clear evidence that defendant unlawfully concealed and withheld important information which bears on this case, and did it it in bad faith.

138.    Such information should have been delivered by defendant on his own after Plaintiff's First or Second Requests, but defendant kept on concealing it even after Plaintiff made *specific requests* to produce it.

139.    Plaintiff offers EXHIBIT C as evidence of such concealment, in the form of Mr. Manuel Tamez emails.

140.    During his Deposition, Mr. Victor Celorio was asked repeatedly by defendant's counsel if he had received, at any point during the years 2005 to 2009, any answer to the letters Mr. Celorio wrote in 2005 to the three executives mentioned above. (EXHIBIT B) Mr. Celorio answered truthfully that no, that he didn't receive from the defendant any answer to those letters. However, the abrasive questioning of defendant's counsel triggered something in Mr. Celorio's memory about other emails he did receive from Google, not as a response to the earlier letters, but unrequested emails from Mr. Manuel Tamez, who was the New Business Manager at Google back in 2007, inquiring about a possible association between the two businesses.

141.    Mr. Celorio had forgotten completely about those emails from Mr. Manuel Tamez because he had lost them after Plaintiff's server was hacked in 2010. Defendant was well aware of the hacking incident since Plaintiff had shared with defendant that information.

41

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

"As I explained before, I lost tons of emails during the main attack. () What I lost was the entire email directory. Not partially: all of it. Thousands of emails got lost. Destroyed. Erased." *see* (EXHIBIT C-1).

142.    At first Mr. Celorio didn't even remember the name of the person or the dates in which the exchanges took place, but he was able to find in an old address notebook the name of Mr. Manuel Tamez and his telephone and email addresses. Then, Plaintif requested through Discovery that defendant produce all the emails from Mr. Manuel Tamez (EXHIBIT C-2).

143.    Defendant ignored the Plaintiff's petition. Completely. Defendant didn't even bother answering the requests. Since the discovery deadline date by then was a just a few days away, it was obvious that defendant was waiting for the Discovery period to lapse so he couldn't be obligated to produce anything. This situation forced the Plaintiff to file a Plaintiff's Combined Motion To Rule On Objections, To Compel Discovery Response And To Extend Discovery Time For Good Cause on September 27, 2012, with just four days before the deadline of October 1. That motion is still pending in this court. (Document 71)

144.    Only then, after Plaintiff filed the Motion to Compel Discovery, the law and the facts forced defendant to provide Plaintiff with a copy of Mr. Tamez emails. Defendant was thus discovered holding the proverbial 'smoking gun', as it were.

## Manuel Tamez Emails

145.   In December 1, 2007, Victor Celorio received an email from a man named Manuel Tamez, who was at that time the New Business Development Manager at Google. Relevant parts of the emails from Manuel Tamez are included herewith as EXHIBIT C, along with a Certified

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

Translation from Spanish to English.

146.   Those emails corroborate that defendant knew at least since 2007 about Plaintiff's patents and technology to print and bind books on demand. And that is the reason that defendant concealed and withheld them from Plaintiff.

147.   The fact that Plaintiff has been able to elicit by pure chance the discovery of such concealed information does serve as firm evidence that the defendant may be withholding an unknown amount of information which may lead to more evidence favorable to the Plaintiff.

148.   Even though defendant tried very hard to conceal and withhold the emails from Manuel Tamez, Manager of New Businesses back in 2007, because that information would help Plaintiff's claims, nonetheless defendant was forced to reveal the following information and it is undisputed because it is evidence which was provided by the defendant himself. (EXHIBIT C).

149.   Furthermore, the emails that Mr. Manuel Tamez sent unrequested to Victor Celorio starting on December 01, 2007, is also undisputed evidence that proves without a doubt that defendant and his Patent Legal counsel knew at least since December 01, 2007 about the patent-in-suit '890.

150.   Those emails combined with the earlier letters that Plaintiff sent to Google in 2005 and internal communications prove with clear and convincing evidence that defendant's executives knew about the '890 patent well in advance of his infringing activities with ODB. That knowledge satisfy the law requirements of law about Willfulness, that the defendant "knew or

43

should have known" about the '890 patent[39], which means the infringement is willful as a matter of law.



### Latches Doctrine

153.    Since Plaintiff is accusing the defendant of starting infringing in 2009, it is impossible for the Doctrine of Latches to be even considered.

### Plaintiff's Evidence Of Damages

154.    Defendant Expert Witness claims that if found guilty, defendant will have to pay only the

---

39  In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed.Cir.2007).

amount of money ODB paid to defendant as royalty from the books downloaded and printed.

155.    This is a false proposition that goes against well established precedents. In reality the standard for calculating Damages is on the *amount on money Plaintiff has lost* (or didn't earn due to the infringing), which up until today is around four million dollars.[40] To recover damages on the theory of "lost profits", a patentee must show that, but for the infringement, it would have made the infringer's sales. *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 864, 226 USPQ 402, 409-10 (Fed.Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

156.    Causation is most easily found where only two companies, the patentee and the infringer, are in the market. *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 653, 225 USPQ 985, 987 (Fed.Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

157.    Plaintiff created the market for this technology from scratch and was selling over a million dollars per year in 2007. Then the economy of the US entered into the Great Depression in December 2007. "The United States went through its longest, and by most measures worst economic recession since the Great Depression between December 2007 and June 2009."[41] Writes the Center on Budget and Policy Priorities. (EXHIBIT Za, first page, first paragraph).

158.    Sales of InstaBook Corp. reached $1,205,417.00 in 2007, (EXHIBIT R2007 CONFIDENTIAL), dropped to $40,575. in 2008, (EXHIBIT R2008 CONFIDENTIAL). In 2009 sales should have recuperated or started to recuperate, but in that year defendant enter into the

---

40   If successful in an infringement suit, a patent owner may recover actual damages or at least a reasonable royalty. 35 U.S.C. Sec. 284 (1982). Where the patentee produces or sells a product (or service) covered by the patent claims, the patentee may seek to recover damages based on a theory of lost profits because the amount is likely to be greater than reasonable royalties. Micro Motion Incorporated v. Kane Steel Co Inc, 894 F. 2d 1318 - United States Court of Appeals, Federal Circuit.

41   Center on Budget and Policy Priorities.( http://www.cbpp.org/cms/index.cfm?fa=view&id=32)

agreement with ODB. InstaBook Corp. disappeared from Google's search engine results and sales of InstaBook Corp. dropped to $28,883.00 (EXHIBIT R2009 CONFIDENTIAL) .



160.   From 2009, while the sales of InstaBook dropped to basically nothing, to 2011, ODB went from "more than a dozen" machines installed (EXHIBIT H, paragraph 6) to over *eighty* machines installed around the world. (EXHIBIT Zc, page 4, paragraph 4)

161.   To recover damages on a theory of lost profits, the patentee must show a reasonable probability that "but for" the infringement, it would have made the sales that were made by the infringer. "But for" causation is often evaluated using the four-factor Panduit test, which requires that the patentee establish:

> • (1) demand for the patented product; (This is proved by InstaBook's Revenue up to 2007. (EXHIBIT R2007 CONFIDENTIAL)

> • (2) absence of acceptable non-infringing substitutes; (There were and there are not now any non-infringing substitutes. Newspaper and scholarly and encyclopedic articles prove that InstaBook was the first and only manufacturer installing this type of equipment in bookstores and libraries. EXHIBIT Q)

> • (3) manufacturing and marketing capability to exploit the demand; (This capability is proved by the fact that in 2006/7 InstaBook sold, manufactured and shipped more than 60 systems. (EXHIBIT R2007 CONFIDENTIAL)

> • (4) the amount of the profit the patentee would have made. (This is proved by InstaBook's Revenue in 2007 (EXHIBIT R2007 CONFIDENTIAL) and Costs of Production of the system

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

EXHIBIT N CONFIDENTIAL) *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978)

162.  Since InstaBook and ODB are the ONLY companies manufacturing these types of machines, and InstaBook Corporation went into paralysis while ODB flourished, the causation relationship that *BUT FOR* the sales of ODB, InstaBook would have made those sales, is evident and clear. InstaBook would have sold over at least 30 to 50 systems per year. (EXHIBIT Zb Damages CONFIDENTIAL).

163.  The combination of ODB plus the unrelenting promotional power of Google, which is under investigation by both the governments of United States EXHIBIT X1, EXHIBIT X2 and the European Union EXHIBIT X3, EXHIBIT X4 drove InstaBook Corporation to extinction.

**Genuine Elements of Dispute**

164.  The are only two genuine elements of dispute at issue:

  1.- Whether the patent-in-suit is valid.

  2.- Whether the defendant is infringing of the patent.

165.  Since the defendant is unable to prove either one with clear and convincing evidence, and does not have the evidence needed to prove that it does *not infringe in a single claim*, then "there is no genuine dispute as to any material fact" and there are no issues left to try at trial.

166.  Therefore this court must find for the Plaintiff, pursuant to Rule 56, Fed.R.Civ.P., which states in relevant part as follows:

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## Conclusion

167.   Because the defendant's evidence, viewed in the light most favorable to him, is insufficient to establish all of the elements of his Defenses, Plaintiff is entitled to summary judgment on his Claims I and II.

168.   In addition, the overwhelming quantity and quality of evidence provided by the Plaintiff in his favor, has proven clearly his allegations of patent infringement on the Claims I and II of his Cause of Action, entitling him to summary judgment on those claims.

## Relief

169.   This honorable court should find for Plaintiff, and declare that patent '890 is valid and enforceable and that defendant is infringing on it as claimed by the Plaintiff. Moreover, this court should find that the infringement was Willful. Moreover, the court should condemn the defendant to pay damages estimated on the standard *BUT FOR* set in *Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir.1978)*[42], (EXHIBIT Zb), and treble those damages based on

---

42   *Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir.1978) see also King Instrument Corp. v. Otari Corp., 767 F.2d 853, 864, 226 USPQ 402, 409-10 (Fed.Cir.1985)*, cert. denied, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). To recover damages on the theory of "lost profits", a patentee must show that, **but for** the infringement, it would have made the infringer's sales. This requirement of causation implicates the patentee's manufacturing capacity and marketing capability, the desires of customers for the claimed invention, the relationship of the claimed invention to the product

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

Willful infringement. Moreover, the court should condemn defendant to pay an ongoing royalty with a range of royalty rates from 12.5% to 20% of the selling price, for all past and future sales of equipment and/or books printed on demand, using '890 technology.

170.    Furthermore this court should also find the defendant in contempt for withholding evidence favorable to the defendant and sanction defendant for misconduct, for concealing evidence, for committing perjury, and for gross abuse of procedural rules. Plaintiff also requests any other sanction that this court deems appropriate under its inherent power

Respectfully submitted this 23th day of October, 2012.

VICTOR MANUEL CELORIO
PRO SE
12300 NW 56th Ave.
Gainesville, Fl. 32653
Tel. 352 3321311 / 352 8708447
vc@victorcelorio.com

---

sold and other factors pertinent to the particular market or parties.

## AUTHORITIES

| | |
|---|---|
| 1 | Aspex Eyewear, Inc. v. E'lite Optik, Inc., No. 3:98-CV-2996D, 2001 WL 204775, at *2 (N.D. Tex. Feb. 27, 2001) ("In cases such as this one, where the technology is accessible to the court and the claims are relatively straightforward, a Markman hearing is unnecessary.") |
| 2 | Biovail Corp. Int'l v. Andrx Pharms., Inc., 239 F.3d 1297, 1301 (Fed. Cir. 2001) (finding it unnecessary to construe claim term that was not relevant to outcome of the case). |
| 3 | Campbell v. McMillin, 83 F. Supp. 2d 761, 764 (S.D. Miss. 2000). |
| 4 | Campbell, 83 F. Supp. 2d at 765 (finding report inadequate because it merely offered conclusory allegations without providing the basis of the opinions) |
| 5 | CollegeNet, Inc. v. ApplyYourself Inc., 418 F.3d 1225, 1236 (Fed. Cir. 2005) |
| 6 | Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983). |
| 7 | Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1379–80 (Fed. Cir. 2004). |
| 8 | Graham v. John Deere Co., 383 U.S. 1, 17 (1966). |
| 9 | Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045–46 (Fed. Cir. 2001) |
| 10 | Hiniker Co., 150 F.3d 1362, 1365-66, 47 USPQ2d 1523, 1526 (Fed. Cir. 1998). |
| 11 | In re Bond, 910 F.2d 831, 15 USPQ2d 1566 (Fed. Cir. 1990). The elements must be arranged as required by the claim, but this is not an ipsissimis verbis test, i.e., identity of terminology is not required. |
| 12 | In re Grasselli, 713 F.2d 731, 743, 218 USPQ 769, 779 (Fed. Cir. 1983) |
| 13 | In re Oelrich, 579 F.2d 86, 91-92, 198 USPQ 210, 214 (CCPA 1978), Piasecki, 745 F.2d at 1471, 1473-74, 223 USPQ at 790 |
| 14 | Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1081 (Fed. Cir. 2005) |
| 15 | Lawman Armor Corp. v. Winner Int'l, LLC, 437 F.3d 1383, 1384 (Fed. Cir. 2006) |
| 16 | Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1317 (Fed. Cir. 2005) |
| 17 | MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1353 (Fed. Cir. 2005) |
| 18 | Network Commerce, Inc. v. Microsoft Corp., 422 F.3d 1353, 1364 (Fed. Cir. 2005) |
| 19 | Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1326 (Fed. Cir. 2004) |
| 20 | Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1149 (Fed.Cir.2005). |
| 21 | Pause Tech., LLC v. TiVo, Inc., 419 F.3d 1326, 1336 (Fed. Cir. 2005) |
| 22 | Peals v. Terre Haute Police Dept., 535 F.3d 621 (7th Cir. July 25, 2008) (No. 07-2804) |

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

23 Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U. S. 1, in which
   Justice Cardozo wrote "there is a presumption of validity, a presumption not to be
   overthrown except by clear and cogent evidence," id. at 2, and "a patent … is presumed to
   be valid until the presumption has been overcome by convincing evidence of error." Id. At
   7.

24 Reed, 165 F.R.D. at 430 n.11 ("[t]he insistence of Rule 26(a)(2)(B) on a 'complete statement
   of all opinions to be expressed and the basis and reasons therefore' has another salutary
   effect. Practitioners should no longer have to face what is referred to in the state courts as a
   'net opinion.' This is defined as an expert's bare conclusion, unsupported by factual
   evidence").

25 Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1359–60 (Fed. Cir. 2006)

26 Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. GmbH, 444 F.3d 1337, 1447
   (Fed. Cir. 2006)

27 Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir. 1992).

28 Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C., 419 F.3d 1346, 1348–49 (Fed. Cir. 2005)

29 Terlep v. Brinkmann Corp., 418 F.3d 1379, 1380 (Fed. Cir. 2005)

30 Accord Seattle Box Co. v. Industrial Crating & Packing, Inc., 756 F.2d 1574, 1581, 225
   USPQ 357, 363 (Fed.Cir.1985) (discretion in methodology of computing lost profits
   damages); see also TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 902, 229 USPQ 525, 529
   (Fed.Cir.), cert. denied, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986)

31 ACS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1574-75 (Fed.Cir.1984).

32 Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 261 F.3d 1329, 1336 (Fed. Cir.
   2001).

33 Aetna Life Ins. Co. v. Haworth, 300 U. S. 227,

34 Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359 (Fed.Cir.1984).

35 American Family Mutual Insurance Co. v. Gustafson, 2011

36 Anatomy of a Patent Case Complex Litigation Committee of the American College of Trial
   Lawyers Federal Judicial Center 2009

37 Applied Materials, Inc. v. Advanced Semiconductors Materials Am., Inc., No. C 92-20643
   RMW, 1995 WL 261407, at *3 (N.D. Cal. Apr. 25, 1995) (excluding expert testimony
   concerning overwork at the PTO and other matters insinuating that the PTO does not do its
   job properly as "irrelevant speculation"); Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F.
   Supp. 2d 252, 255–56 (W.D.N.Y. 2000) (ruling inadmissible testimony on "the problems
   Examiners encounter with the completeness or 'file integrity' of the 'shoes' maintained at
   the PTO," "the difficulties Examiners face in discovering and obtaining prior art references
   other than patents," and "the time constraints under which Examiners in the PTO must

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

operate"; "generalized testimony about 'problems' in the PTO is not admissible").

38 Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1561 (Fed. Cir. 1988)

39 Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all other issues presented by the parties.")

40 *Bard Peripheral Vascular V. Wl Gore & Associates,* 670 F.3d 1171 (2012), United States Court of Appeals, Federal Circuit.

41 Bausch & Lomb, 79 F. Supp. 2d at 255. See also, e.g., W. Elec. Co. Inc. v. Piezo Tech., Inc., 860 F.2d 428, 433 (Fed. Cir. 1988) ("It is no more appropriate to question a patent examiner's technical expertise than it is to question the quality of a judge's law school education or judicial experience."); Neutrino Dev. Corp. v. Sonosite, Inc., 410 F. Supp. 2d 529, 544 (S.D. Tex. 2006) ("The Court finds that, to the extent that [the expert's] testimony simply addresses the potential pressures and potential for error at the PTO, such testimony is inadmissible. Such general testimony tends to undermine the presumption of validity.") (citation omitted).

42 Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1304–07 (Fed. Cir. 2005)

43 Canon Computer Sys.,Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed.Cir.1998), and "is never annihilated, destroyed or even weakened regardless of what facts are of record."

44 Cardinal Chemical Co. v. Morton Int'l, Inc., 508 US 83 - Supreme Court

45 Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004), cert. Denied, 126 S. Ct. 337, 163 L. Ed. 2d 49 (2005) (quoting Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984))

46 Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004), cert. Denied, 126 S. Ct. 337, 163 L. Ed. 2d 49 (2005) (quoting Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984))

47 Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983). This standard of proof applies equally in the summary judgment context. Nat'l Presto, 76 F.3d at 1189

48 Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998) (quoting C.R. Bard, Inc. v. Advanced Cardiovascular, Inc., 911 F.2d 670, 672 (Fed. Cir. 1990))

49 Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).

50 Eli Lilly & Co. v. Teva Pharm. USA, Inc., 619 F.3d 1329, 1336 (Fed. Cir. 2010)

51 Environmental Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 218 USPQ 865 (Fed. Cir. 1983), cert. denied, 464 U.S. 1043 (1984). The examiner must ascertain what would have been obvious to one of ordinary skill in the art at the time the invention was made, and not to the inventor, a judge, a layman, those skilled in remote arts, or to geniuses in the art at hand.

52

| | |
|---|---|
| 52 | Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351 (Fed. Cir. 2006) |
| 53 | Graham v. John Deere Co., 383 U.S. at 17, 148 USPQ at 467. See also, e.g., In re Piasecki, 745 F.2d 1468, 1473, 223 USPQ 785, 788 (Fed. Cir. 1984). |
| 54 | Group One Ltd. v. Hallmark Cards, Inc., 407 F.3d 1297, 1303 (Fed. Cir. 2005). |
| 55 | In re Gabapentin Patent Litig., 395 F. Supp. 2d 153, 158 n.3 (D.N.J. 2005) (deciding summary judgment motion without Markman hearing) |
| 56 | IN RE MARKLE, 2008 |
| 57 | In re Recreative Technologies, 83 F.3d 1394, 38 USPQ2d 1776 (Fed. Cir. 1996). |
| 58 | IN RE RIBOZYME PHARMACEUTICALS, INC. SECURITIES, 209 F. Supp. 2D 1106 (2002) |
| 59 | In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed.Cir.2007). |
| 60 | In re Wands, 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed. Cir. 1988) |
| 61 | Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378 (Fed. Cir. 2005); |
| 62 | Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1323 n.3 (Fed. Cir. 2004) ("Expert testimony was not required, the technology being easily understood without expert testimony.") |
| 63 | *King Instrument Corp. v. Otari Corp., 767 F.2d 853, 864, 226 USPQ 402, 409-10 (Fed.Cir.1985)*, cert. denied, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). To recover damages on the theory of "lost profits", a patentee must show that, **but for** the infringement, it would have made the infringer's sales. This requirement of causation implicates the patentee's manufacturing capacity and marketing capability, the desires of customers for the claimed invention, the relationship of the claimed invention to the product sold and other factors pertinent to the particular market or parties. |
| 64 | Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 653-56, 225 USPQ 985, 987-89 (Fed.Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). (discretion in methodology of computing lost profits damages) |
| 65 | Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 653, 225 USPQ 985, 987 (Fed.Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). Causation is most easily found where only two companies, the patentee and the infringer, are in the market. |
| 66 | Markman v. Westview Instruments, Inc., 52 F.3d 967, 981 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). |
| 67 | Micro Motion Incorporated v. Kane Steel Co Inc, 894 F. 2d 1318 - United States Court of Appeals, Federal Circuit. |
| 68 | Micro Motion Incorporated v. Kane Steel Co Inc, 894 F. 2d 1318 - United States Court of |

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

Appeals, Federal Circuit. If successful in an infringement suit, a patent owner may recover actual damages or at least a reasonable royalty. 35 U.S.C. Sec. 284 (1982). Where the patentee produces or sells a product (or service) covered by the patent claims, the patentee may seek to recover damages based on a theory of lost profits because the amount is likely to be greater than reasonable royalties.

69 Microsoft v. i4i Limited Partnership, 131 S.Ct. 2238 (2011)

70 Mineral Separation v. Hyde, 242 U.S. 261, 270 (1916)

71 Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1326 (Fed. Cir. 2004)

72 Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir.1978)

73 Peals v. Terre Haute Police Dept., 535 F.3d 621 (7th Cir. July 25, 2008) United States Court of Appeals For the Seventh Circuit.

74 Perkins v. FEDERAL FRUIT & PRODUCE COMPANY, INC., 2012

75 Phillips v. AWH Corp., 415 F. 3d 1303 - United States Court of Appeals, Federal Circuit (quoting Key Pharms., 161 F.3d at 716. )

76 Prima Tekil, L.L.C. v. Polypap, S.A.R.L., 412 F.3d 1284, 1290 n.7 (Fed. Cir. 2005) ("Expert testimony was not required, the technology being easily understood without expert testimony.")

77 Quoting DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1360 (Fed.Cir.2006);

78 *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989). "The identical invention must be shown in as complete detail as is contained in the ... claim."

79 Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 718, 21 USPQ2d 1053, 1057 (Fed. Cir. 1991)."The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry."

80 Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir. 1996).

81 Spectra Corp. v. Lutz, 839 F.2d 1579, 1581 n.6 (Fed. Cir. 1988). Summary judgment may be particularly appropriate in patent cases where the only real dispute between the parties is that of claim construction—which is a question of law for the court to decide.

82 Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983).

83 United States v. Telectronics, Inc., 857 F.2d 778, 785, 8 USPQ2d 1217, 1223 (Fed. Cir. 1988)

84 Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991).

85 Velander v. Garner, 348 F.3d 1359, 1363 (Fed.Cir. 2003)

86 Vivid Techs., Inc. v. Am. Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999)

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

87 W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 220 USPQ 303, 313 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984). "It is difficult but necessary that the decisionmaker forget what he or she has been taught . . . about the claimed invention and cast the mind back to the time the invention was made (often as here many years), to occupy the mind of one skilled in the art."

## RULES

88 Federal Rule of Civil Procedure 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

89 Federal Rule of Civil Procedure 26(A)(ii) and 26(2)(D)(ii)

90 Federal Rule of Civil Procedure 56

91 Federal Rule of Civil Procedure 56(c)(4)

92 Federal Rules of Evidence 402. Relevant Evidence Generally Admissible; Irrelevant Evidence
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

93 Federal Rules of Evidence Rule 602. Lack of Personal Knowledge
A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. **This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.**

94 Federal Rules of Evidence Rule 607. Who May Impeach
The credibility of a witness may be attacked by any party, including the party calling the witness.

95 Federal Rules of Evidence 611(a). Evidence introduced on rebuttal serves to 'rebut new evidence or new theories proffered in the defendant's case-in-chief,' and is not limited by the fact that the plaintiff could have introduced the proffered evidence in his case-in-chief.

96 Federal Rules of Evidence Rule 702. Testimony by Experts
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case*.

97 Federal Rules of Evidence Rule 703. Bases of Opinion Testimony by Experts

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

98 Local Rule 7.1(B)

99 Title 35, United States Code, Section 102.
Prior art is defined by Title 35, United States Code, Section 102, which states: "A person shall be entitled to a patent unless...."()"the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

## REFERENCES

100 Anatomy of a Patent Case Complex Litigation Committee of the American College of Trial Lawyers Federal Judicial Center 2009

101    *Nature of Science and the Scientific Method*. Geological Society of America. http://www.geosociety.org/educate/natureOfScience.htm

102 University of Maryland Computer Science Department (http://www.cs.umd.edu/class/sum2003/cmsc311/Notes/BitOp/asciiBin.html)

Plaintiff's Motion for Summary Judgment 1:11-CV-79-SPM/JRG

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Victor Manuel CELORIO, | Gainesville Division |
| *PRO SE* Plaintiff, | |
| -against- | 1:11-CV-79-SPM/JRG |
| GOOGLE, INC., et all. | Jury Trial Requested |
| DEFENDANTs. | |

### CERTIFICATE OF SERVICE

I, Victor Celorio, do hereby CERTIFY that a true and correct copy of the foregoing has
been furnished via PDF ELECTRONIC FORMAT, on the 22th day of October, 2012, to:

Adam B. Landa
Greenberg Traurig, P.A.
450 So. Orange Avenue, Suite 650 | Orlando, FL 32801

LandaA@gtlaw.com

*Plaintiff:*

*PRO SE*
*VICTOR MANUEL CELORIO*
*12300 NW 56TH AVE*
*GAINESVILLE, FL. 32653*
*352 332 1311*
*vc7@instabook.net*

57