IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

VICTOR MANUEL CELORIO,

    Plaintiff,

v.                                                                   CASE NO. 1:11-cv-79-RV-GRJ

GOOGLE INC., et al.,

    Defendants

_____/

## REPORT AND RECOMMENDATION

Plaintiff Victor Manuel Celorio filed suit against On Demand Books and Google Inc. in April 2011, alleging infringement of U.S. Patent No. 6,012,890 ("'890 Patent"), his patent for an "Electronic Bookstore Vending Machine." (Docs. 1, 13.) On Demand Books was dismissed from the case on jurisdictional grounds (Docs. 38, 41), and the matter is currently before the Court for patent claim construction, as described in *Markman v. Westview Instruments, Inc.,* 52 F.3d 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The undersigned has considered the submissions of the parties (Docs. 106, 124) and this report recommends appropriate claims construction for 11 disputed claim terms.[1]

## I. STANDARDS

### A. Claim Construction

"When the parties present a fundamental dispute regarding the scope of a claim

---

[1] Google has filed a motion for summary judgment that relies in part on the claim construction recommended by the undersigned. (Doc. 104.) Plaintiff has also filed a motion for summary judgment. (Doc. 109.) These motions will be addressed by the Court in a separate report and recommendation.

term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008). The Court construes patent claims as a matter of law. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). The Court need only construe "those terms . . . that are in controversy , and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999); *see also U.S. Surgical Corp. v. Ethicon, In.c,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.")

Intrinsic evidence–including the claims themselves, the specification, and the prosecution history–is first examined in claim construction. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Courts may also rely on extrinsic evidence, such as expert testimony, dictionaries, and treatises, in claim construction. *Id*. at 1317. However, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Importantly, however, the claims do not stand alone, and "are part of a 'fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc)). This is especially true

because "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Id.* at 1316.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Such ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "Furthermore, a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001).

## B. Means-Plus-Function

Reading limitations from the specification into the claims "should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'" *Pfizer, Inc. v. Ranbaxy Labs, Ltd.,* 457 F.3d 1284, 1290 (Fed. Cir. 2006) (quoting *Phillips*, 415 F.3d at 1323). However, where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp. v. VSI Intern., Inc.,* 174 F.3d 1308, 1318 (Fed. Cir. 1999). That paragraph of the Patent Act provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of a structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. The construction of claims under this provision is a two-step process: (1) the Court identifies the claimed function; and (2) the Court identifies the

corresponding structure in the written description necessary to perform the function. *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1208 (Fed. Cir. 2002).

## II. <u>THE PATENT</u>

The patent at issue in this case is the '890 Patent, which provides a method and system for producing books on demand. Using this "Electronic Bookstore Vending Machine," a user can select a book and the machine will print and bind the book. Claim 1 is a representative independent claim, reciting many of the claim terms that Defendant presents for construction:

> 1. A device for printing and binding a book, comprising:
>
> a receiving means for receiving data corresponding to a book's content;
>
> a formatting means for formatting the book's content into a book distribution;
>
> a printing means for printing the book's content on paper sheets upon receipt of a signal from said receiving means;
>
> a clamping means for clamping the printed sheets into a book block;
>
> a glueing means for applying glue to a spine of the book block;
>
> a cutting means for cutting said paper sheets into smaller sheets;
>
> wherein said printing means prints multiple pages of the book's content on each paper sheet and said cutting means cuts said paper sheet into smaller sheets such that each smaller sheet has a book page printed on each side.

('890 Patent, Doc. 105, Exh. 9; col. 12, lines 15-40.) Plaintiff asserts 120 claims in his patent, 15 of which are independent claims (Claims 1, 5, 6, 14, 20, 21, 25, 26, 33, 37, 38, 54, 61, 68, 75).

## III. <u>CLAIM CONSTRUCTION</u>

Defendant has provided a proposed construction for each of the 11 disputed

terms. (Doc. 106.) In response, Plaintiff asserts that the plain language of the '890 patent and the ordinary meaning of each term should prevail, and asks the Court to reject all of Defendant's proposed definitions. Plaintiff has not provided specific proposed constructions for the disputed terms. Nor has Plaintiff addressed the application of the 35 U.S.C. § 112, ¶ 6 means-plus-function elements to the disputed terms, other than a general argument that limitations from the specification should not be read into the claims. (Doc. 124.)

**A. Formatting/formatting means (Independent Claims 1, 5, 6, 14, 20, 21, 25, 26, 54, 61, 68, 75)**

These claims require a formatting means for "formatting the book's content into a book distribution." ('890 Patent, col. 12, lines 21-22.) Defendant argues that "formatting" as used in the claims is indefinite under 35 U.S.C. § 112, ¶ 2, and therefore invalid. (Doc. 106, p. 12.) Alternatively, Defendant proposes that the Court construe "formatting/formatting means" to mean:

> use of an electronic text file containing alphanumeric characters of a book's textual content, rather than a scanned images of book pages, to lay out and organize the book's textual content into pages according to specifications such as font, font size, and page dimensions.

(Doc. 106, Exh. A.)

The Court declines to make an indefiniteness determination at this procedural posture. The Federal Circuit has "not endorsed a regime in which validity analysis is a regular component of claim construction." *Phillips*, 415 F.3d at 1327 (citing *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,* 403 F.3d 1364, 1368-69 (Fed. Cir. 2005) (cautioning the construing court not to "put the validity cart before the claim construction

horse")). Validity questions are more properly raised later in the proceedings, i.e., when the Court considers the motions for summary judgment currently pending.

As to the proper construction of the term "formatting means," where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp. v. VSI Intern., Inc.,* 174 F.3d 1308, 1318 (Fed. Cir. 1999). Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to format books; and (2) the corresponding structure in the written description necessary to perform the function is the "distribution means 7" in Figure 4 of the '890 Patent. *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1208 (Fed. Cir. 2002).

The specification of the '890 Patent describes "a formatting means for formatting the book's content into a book distribution." ('890 Patent, col. 12, lines 21-22.) It discloses a method that can "allow the reformatting of the size and type of fonts." (*Id.* at col. 3, lines 23-24.) In his response to Defendant's *Markman* brief, Plaintiff provides charts which provide the specification's description of his independent claims. He consistently describes the formatting means as one that "distributes and formats the text into pages" and corresponds the formatting means to the structure in Figure 4:

> distribution means 7 [that] distributes information to the printing means 8 regarding the size of each sheet of paper, number of pages to print onto each sheet of paper, ways of distributing said pages into the sheets of paper, numbering of said pages, order in which they are to be printed, type and size of fonts to be used, design of the printed matter, graphics to be included, etc.

('890 Patent, col. 9, lines 1-6.) This definition is substantially similar to Defendant's proposed construction of "formatting/formatting means." (Doc. 106, Exh. A.)

Defendant's proposed construction is narrower in that it specifies that the

information being formatted and/or distributed is an electronic text file rather than scanned images of book pages. This is consistent with the language of the '890 Patent, which describes, in the "Brief Summary of the Invention," the progression of an "electronic text file" from a central distribution unit to the EBS, which then prints and binds the book. The '890 Patent also distinguishes prior art systems that use image files rather than electronic text files. ('890 Patent, col. 2, lines 10-34.)

Applying § 112, ¶ 6, the "formatting means" is limited to the means specified in the written description. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the "distribution means 7" that is consistent with the language of the '890 Patent.

### B. Cutting/cutting means (Independent Claims 1, 14, 20, 21)

These claims and their dependent claims require "a cutting means for cutting said paper sheets into smaller sheets." ('890 Patent). Defendant proposes that the Court construe the term "cutting/cutting means" to mean "separating a paper sheet into smaller sheets that have a book page printed on each side." (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp.,* 174 F.3d at 1318. Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to cut paper sheets into smaller sheets; and (2) the corresponding structure in the written description necessary to perform the function is the "paper cutting means 10" in Figures 5D, 5E, and 6A of the '890 Patent. *Texas Digital Systems,* 308 F.3d at 1208.

The specification of the '890 Patent describes a "paper cutting means 10" which "can cut the paper into the requested size for the pages that form a book." ('890 Patent, col. 9, lines 46-48.) It "slices the sheets, and then the paper transporting means 9 can deposit those small sheets of paper onto, for example, a paper tray." (*Id.* at lines 49-51.) The specification goes on to contemplate printing multiple pages on single, uncut sheets, on both sides, which is then cut into smaller sheets. (*Id.* at cols. 7-8.)

Applying § 112, ¶ 6, the "paper cutting means" is limited to the means specified in the written description. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the "paper cutting means 10."

### C. Paper sheet receiving means  (Independent Claims 33, 37, 38)

These claims and their dependent claims require "a paper sheet receiving means." ('890 Patent). Defendant proposes that the Court construe the term "paper sheet receiving means" to mean "a tray that holds smaller sheets of paper, after they have been cut from a larger sheet, until the printer finishes printing all of pages of the book." (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp.,* 174 F.3d at 1318. Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to receive paper; and (2) the corresponding structure in the written description necessary to perform the function is the "paper-tray station 11" in Figures 7A and 7B of the '890

Patent.  *Texas Digital Systems,* 308 F.3d at 1208.

The specification of the '890 Patent describes a "paper-tray station 11" which "holds the smaller loose sheets of paper one on top of other until the printer finishes printing all of pages of the book" and later "open[s] and release[s] the plurality of sheets into, for example, a movable clamping means 12 such that all of the pages become a single book block."  ('890 Patent, col. 10, lines 45-47, 50-53.)

Applying § 112, ¶ 6, the "paper receiving means" is limited to the means specified in the written description.  Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the paper-tray station 11.

**D.  Notching/notching means  (Claims 2, 22, 34, 41, 42, 48, 76, 82, 92, 100, 109, 115, 116)**

These claims require "a notching means for notching a spine edge of the printed sheets, wherein said notching created notches which enhance adhesion of the glue on the spine of the book block."  ('890 Patent).  Defendant proposes that the Court construe the term "notching/notching means" to mean "using a circular cutting instrument to cut the edges of the sheets of paper with horizontal, vertical, zig-zag, or interlocking cuts of a depth of about 0.5 mm to 1.5 mm and not merely roughening the spine of a book block."  (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies.  *Al-Site Corp.,* 174 F.3d at 1318.  Using the two-step process under 35

U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to notch the edge of printed sheets; and (2) the corresponding structure in the written description necessary to perform the function is the circular cutting instrument in Figure 6 of the '890 Patent. *Texas Digital Systems,* 308 F.3d at 1208.

The specification of the '890 Patent discloses one structure corresponding to notching – a circular cutting instrument in Figure 6 of the '890 Patent. According to the description of Figure 6:

> the paper cutting means 10 can cut the edges of the paper in a pattern that, for example, can be composed of a vertical cut 31 and a series of horizontal cuts 32 which, for example, can create notches. Other notch patterns can also be implemented, for example, a zig-zag pattern which allow triangular notches or an interlocking notch pattern. In a preferred embodiment, the sheets are cut and notched at the same time, for example with a single circular cutting instrument which comprises a cutting surface which implements the desired notch pattern.

('890 Patent, col. 9, lines 55-64.) The specification describes the notching as "an improvement over the traditional methods of roughening the spine after the book block is formed." (*Id.* at col. 10, lines 11-13.) The specification also describes the preferred depth of the notches:

> It is preferred that the depth of the notches be in the range of about 0.5 mm to about 1.5 mm, in order to allow for sufficient binding strength of the glue without creating difficulty in aligning the book pages with each other to forma book block. More preferably, the depth of the notches should be approximately 1.0 mm.

(*Id.* at col. 10, lines 18-23.) In a specific embodiment, the pages can be notched "after the pages are brought together to form a book block, for example by a circular sawing means. In this embodiment, the sides of the sawing blade can rough the sides of the notches to enhance adhesion of the clue." (*Id.* at col. 10, lines 24-28.) In an alternative

Page 11 of 19

embodiment, paper that has already been notched can be used. (*Id.* at col. 10, lines 31-35.)

Applying § 112, ¶ 6, the "notching means" is limited to the means specified in the written description. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the corresponding circular cutting instrument.

**E. Cover pages & spine cover label (Independent Claims 5, 25, 37, 54, 68)**

Claim 5 is representative of these claims, which require:

> a labeling means for attaching a spine cover label to the spine of the book, wherein said printing means prints a cover image on cover stock to create cover pages, wherein said cover pages are included in the book block clamped together by the clamping means and glued together by the glueing means, and wherein said spine cover label is attached to the spine of the book so as to overlap onto the cover pages.

('890 Patent, col. 12.) Defendant proposes that the Court construe the term "cover pages" to mean: "the outermost pages of a book, the page bearing the cover image and that is printed on cover stock" and that "spine cover label" be construed to mean "a label that can be attached to the spine of a book, and when so attached overlaps the cover pages but does not obscure the cover image." (Doc. 106, Exh. A.) Defendant concedes that construction may be unnecessary because the plain language of the claim makes clear that the spine cover label is separate from (and overlaps) the cover pages. (Doc. 106, p. 20.) However, Plaintiff, during his deposition, asserted that the spine cover label is "the whole thing," "the cover of the book . . [a]nd it's labeled [sic,

label]." (Doc. 106.)² Accordingly, Defendant seeks clarification that the spine cover label is separate from the cover pages.

Although it is clear from the plain language of the statute that the "spine cover label" and "cover pages" are distinct, to avoid any further confusion regarding Plaintiff's comments during the deposition, the undersigned recommends that the Court adopt Defendant's proposed constructions of the terms "cover pages" and "spine cover label," as detailed above.

**F. Signal (sent to printing means) (Independent Claims 1, 5, 6, 14, 20, 54, 61, 68, 75)**

The '890 Patent calls for "a receiving means for receiving data corresponding to a book's content" and "a printing means for printing the book's content on paper sheets upon receipt of a signal from said receiving means." (See, e.g., '890 Patent, col. 12.) Defendant proposes that "signal" be construed as: "an electronic signal representing the text to be printed, not images of the book's pages." (Doc. 106, p. 23; Exh. A.) The specification for the '890 Patent describes a specific embodiment where the temporary memory storage inside the electronic bookstore vending machine "can send electronic signals representing text to be printed by a printing means." ('890 Patent, col. 7.) Defendant proposes taking this definition from the specification but adding the more narrow construction that the signal does not contain images of the book's pages. Based on the recommended construction of "formatting/formatting means" above, as

---

²Defendant's cite to Exh. 19 of the exhibits to their statement of facts (Doc. 105); however the cited pages of Plaintiff's deposition transcript (236:23-237:18) are not contained in Exh. 19.

well as the plain language of the '890 Patent, the undersigned recommends that the Court adopt Defendant's proposed construction of the term "signal."

### G. Input means  (Independent Claims 14, 54, 61)

Claim 14 is representative of the '890 Patent's description of an "input means": "an input means for inputting requests for books." ('890 Patent, col. 13.)  Defendant proposes that the Court construe "input means" to mean: "a touch screen display, a keyboard, or a voice recognition system to allow a user to provide input (such as paper size, font size, and type of fonts to be used to print a book's text), preview the information pertaining to available books, and preview the received data." (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies.  *Al-Site Corp.,* 174 F.3d at 1318.  Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to input requests for books; and (2) the corresponding structure in the written description necessary to perform the function is "user interaction means 6" in Figure 4 of the '890 Patent.  *Texas Digital Systems,* 308 F.3d at 1208.

The '890 Patent states that "user interaction means 6 can be, for example, a touch screen display, a keyboard, a voice recognition system, or any other system to allow a user to provide input and/or preview the information pertaining to available books and/or preview the received data." ('890 Patent, col. 6, lines 36-40.)  Customers can issue instructions through the user interaction means 6, such as "paper size, font size, and type". ('890 Patent, col. 7, lines 4-11.)  The '890 Patent explains:

> In a specific embodiment, when all the data is received, the EBS user interaction means 6 can allow the customer to chose [sic], for example, the size and type of fonts to be used in the text and the physical size of the book to be produced. This choice of fonts is particularly beneficial for visually challenged readers.

('890 Patent, col. 7, lines 23-26.)

Applying § 112, ¶ 6, the "input means" is limited to the means specified in the written description. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the user interaction means 6.

**H. Receiving means (Independent Claims 1, 5, 6, 14, 20, 21, 25, 26, 54, 61, 68, 75)**

The '890 Patent describes a means for receiving paper and a separate means for receiving data. The "paper sheet receiving means" has been construed above; the current disputed claim term "receiving means" refers to the receipt of data. Defendant proposes that the Court construe "receiving means" to mean: "a device that receives the control data and electronic text data of a book, including floppy disks, optical disks, magnetic storage devices, or via a modem over a telephone line, satellite, cable, or wireless feed." (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp,* 174 F.3d at 1318. Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to receive data; and (2) the corresponding structure in the written description necessary to perform the function is the "receiving means 4" in Figure 2B of the '890 Patent. *Texas*

*Digital Systems, Inc.,* 308 F.3d at 1208.

The '890 Patent describes the function of the receiving means 4 as to "receive data electronically, for example via telephone line, satellite, cable, wireless feed or other type of device to receive electronic data." ('890 Patent, col. 5, lines 61-63.) In addition to these remote means to receive electronic data, the specification also states: "Alternatively, the EBS can receive the electronic text file by any other available means, for example, floppy disks, optical disks, magnetic storage devices, via a modem, or from another computer." (*Id.* at col. 3, lines 7-10.)

Applying § 112, ¶ 6, the data "receiving means" is limited to the means specified in the written description. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the receiving means 4 in specification.

### I. Glue/Glueing Means

All of the claims in the '890 Patent require the application of glue to bind a book. Defendant proposes that the Court construe the term "glue" to mean "cold water based glue" and "glueing means" to mean "a device that applies cold glue. (Doc. 106, Exh. A.)

Where the word "means" appears in a claim element in association with a function, it is presumed to be a means-plus-function elements to which 35 U.S.C. § 112, ¶ 6 applies. *Al-Site Corp.,* 174 F.3d at 1318. Using the two-step process under 35 U.S.C. § 112, ¶ 6, the Court determines that: (1) the claim function is a means to apply glue to the spine of a book; and (2) the corresponding structure in the written description necessary to perform the function is the "glueing means 14" in Figures 2

and 12A of the '890 Patent. *Texas Digital Systems, Inc.,* 308 F.3d at 1208.

The specification of the '890 Patent describes the "glueing means 14" as "a glueing means 14 to apply cold glue to the spine of the book." ('890 Patent, col. 6, lines 16-17.) In describing the glueing means illustrated in Figure 12, the specification states:

> the glue is preferably, a water based glue with a liquid viscosity that allows it to penetrate deep into the notches of the paper, improving its adhesive force . . . Water based glue is safe to use under any circumstances since it does not release harmful fumes, in contrast to the hot glue of thermal binders. Cold glue may be stored indefinitely in a sealed container 37, and may be applied either with a pump 38, a dispersing gun, or other applying means.

('890 Patent, col. 11, lines 16-27.) The specification of the '890 Patent indicates that cold water based glue is used in a preferred embodiment of the invention, but "other glues can also be used, for example hot glues." ('890 Patent, col. 10, lines 36-38.) The specification goes on to note the advantages of cold glue, such as lack of harmful fumes, cost savings, and more flexibility of the book spine. (*Id.* at lines 38-43.) This is the only reference in the specification to the use of hot glue, and it is not made in connection with a description of the glueing means 14.

Applying § 112, ¶ 6, the "glueing means 14" is limited to the means specified in the written description, which limits the glueing means to cold glue. Accordingly, the undersigned recommends adoption of Defendant's proposed construction, as detailed above, which properly incorporates the means-plus-function limitations by using the description of the glueing means 14. It follows, then, that because the glueing means 14, the only means to apply glue in the process of binding the book, is limited to cold glue pursuant to the application of § 112, ¶ 6, that the claim term "glue" should be

construed to mean cold water based glue. The '890 Patent's singular reference to the use of hot glue does not change the analysis under § 112, ¶ 6, which limits the glueing means 14 to cold glue.[3]

## V. **RECOMMENDATION**

In summary, the undersigned recommends the following claim constructions:

**1. "formatting" / "formatting means"**

use of an electronic text file containing alphanumeric characters of a book's textual content, rather than scanned images of book pages, to lay out and organize a book's textual content into pages according to specifications such as font, font size, and page dimensions.

**2. "cutting" / "cutting means"**

separating a paper sheet into smaller sheets that have a book page printed on each side

**3. "paper sheet receiving means"**

a tray that holds smaller sheets of paper, after they have been cut from a larger sheet, until the printer finishes printing all of pages of the book

**4. "notching" / "notching means"**

using a circular cutting instrument to cut the edges of the sheets of paper with horizontal, vertical, zig-zag, or interlocking cuts of a depth of about 0.5 mm to 1.5

---

[3] Furthermore, this construction is consistent with Plaintiff's statements in the prosecution history of a related patent for an electronic bookstore vending machine, U.S. Patent No. 6,213,703 (the '703 Patent, Doc. 105, Exh. 11.) The prosecution history of the '703 Patent, which an examiner found patentably indistinct from the '890 Patent, is relevant to the instant claims construction. *See, e.g., Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980 (Fed. Cir. 1999) (applying prosecution history of a patent to a related patent with essentially identical claim limitations). The prosecution history of the '703 Patent reflects that Plaintiff distinguished prior patents using a stapler or hot-melt binder from his invention, which revealed a "cold water glue binder." (Doc. 105, Exh. 15, p. 5.) Plaintiff described as a book in the context of the '703 Patent as "the final byproduct of text files printed in paper sheets and bound to a cover stuck by a water based cold glue." (*Id.* at 40.)

mm and not merely roughening the spine of a book block

### 5. "cover pages"

the outermost pages of a book, the page bearing the cover image and that is printed on cover stock

### 6. "spine cover label"

a label that can be attached to the spine of a book, and when so attached overlaps the cover pages but does not obscure the cover image

### 7. "signal (sent to printing means)"

an electronic signal representing the text to be printed, not images of the book's pages.

### 8. "input means"

a touch screen display, a keyboard, or a voice recognition system to allow a user to provide input (such as paper size, font size, and type of fonts to be used to print a book's text), preview the information pertaining to available books, and preview the received data.

### 9. "receiving means"

a device that receives the control data and electronic text data of a book, including floppy disks, optical disks, magnetic storage devices, or via a modem over a telephone line, satellite, cable, or wireless feed.

### 10. "glue"

cold water based glue

### 11. "glueing means"

a device that applies cold glue

**IN CHAMBERS** this 12th day of August 2013.

                                *s/Gary R. Jones*
                                GARY R. JONES
                                United States Magistrate Judge

## NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.